Thomas A. HELLANDER, Doing Business as Tom Hellander Company

v.

UNITED STATES

No. Cong. 7–56.

United States Court of Claims.

Dec. 2, 1959.

J. A. Curtiss, Washington, D. C., for plaintiff.

Edward L. Metzler, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., Clare E. Walker, New York City, on the brief, for defendant.

LARAMORE, Judge.

In this action plaintiff seeks to recover damages in the amount of $66,349.30 allegedly incurred by him in the performance of a contract with the Bureau of Reclamation for the construction of certain earthwork and structures for an irrigation project. His claim is in five counts: (1) as the result of faulty contract specifications, he incurred repair costs in order to build siphons that would not leak. Said repair costs were occasioned by reason of defendant's use of the irrigation system before it was formally accepted; (2) that upon oral assurance of defendant's agents that the work of plaintiff's subcontractor was completed, he paid the subcontractor and released him of further obligation under the sub-

contract. Subsequently plaintiff alleges he was required to "reconstruct and recomplete" said work thereby causing plaintiff additional cost and expense; (3) because of unusually heavy rainfall he was delayed, thereby causing damage; (4) that the methods used in calculating payment for certain excavation was contrary to the terms of the contract; and (5) that he is entitled to a reasonable profit on the items alleged in the first three paragraphs of the petition.

The case comes before this court as a result of Senate Resolution 247, agreed to on April 30, 1956. The resolution referred a Senate bill and directs this court to report findings of fact and conclusions as shall be sufficient to inform the Congress of the nature and character of the demand of the plaintiff's company as a legal or equitable claim, and the amount, if any, legally or equitably due from the United States to the claimant.

The facts are somewhat voluminous and are set forth in detail in the findings of fact which are attached hereto. A summary of said facts is as follows:

Plaintiff on March 5, 1951 entered into a contract with the Bureau of Reclamation to construct earthwork and structures for laterals, sublaterals, drains and channel changes on the Superior-Courtland Unit, Bostwick Division, Nebraska-Kansas Missouri River Basin Project. The contract was based upon unit prices for a total estimated consideration of $234,547. The United States Guarantee Company, a New York Corporation, executed the usual performance bonds as plaintiff's surety.

The work covered by the contract included the following principal components:

"1. Excavation and earthwork of approximately 27 miles of earth section for laterals.

"2. Excavation and earthwork for approximately 2 miles of drains and channel changes.

"3. Earthwork and construction for structures, including flumes, cul-

verts, division boxes, turnouts, checks, drops, chutes, and concrete pipe siphons, road crossings, and railroad crossings.

"4. Excavation and earthwork for approximately 0.1 mile of county road relocation.

"5. Application of fertilizer on approximately 25 acres of lateral banks, spoil banks and banks of drain ditches.

"6. Seeding of approximately 80 acres of lateral banks, spoil banks, and banks of drain ditches."

Notice to proceed was given by letter of March 20, 1951 and the contract was to be completed within 300 calendar days from the receipt of such notice.

The contract work included much earthwork and grading, which the plaintiff subcontracted to Harley O. Peterson. The laying of precast concrete pipe was also a major part of the work, as 52 siphons of varying size and length were involved. The pipe size varied from 18 inches in diameter to 30 inches in diameter. The system of laterals when finished was to irrigate farm lands in the vicinity of Superior, Nebraska, and extended over a lineal distance of 24 miles.

Before undertaking the contract in suit, plaintiff had had no experience in laying or joining precast concrete pipe designed to support hydrostatic pressure. Prior to bidding the contract plaintiff made no study, nor did he otherwise inquire as to the experience of other contractors on similar construction.

The initial operations of plaintiff were severely impeded by above-normal rainfall each month during 1951, except for the months of November and December.

Due to inclement weather plaintiff on three occasions requested extensions of time and on June 10, 1952 the contracting officer issued formal findings of fact pursuant to Article 9 of the contract, in which he concluded that plaintiff was delayed 90 days in the completion of the work due to weather conditions. The time for performance was thereby extended to August 1, 1952. The findings

of fact were transmitted to plaintiff by letter of June 13, 1952 and the plaintiff was advised of the right of appeal if such findings were unsatisfactory. On June 21, 1952 plaintiff wrote the acting construction engineer stating that the findings of fact were satisfactory. No liquidated damages were finally assessed against, or paid by, the plaintiff.

The defendant caused the plaintiff no damage whatsoever on account of the period of inclement weather in 1951. As noted earlier, plaintiff was given such extensions of time for completion as required to excuse the payment of any liquidated damages.

Apparently the work of plaintiff's subcontractor, Harley O. Peterson, proceeded satisfactorily to the plaintiff and generally satisfactory to the defendant's field inspectors. On July 19, 1952 plaintiff paid Mr. Peterson the sum of $5,000 by check. Plaintiff contends that prior to this he had been given oral assurance by either Mr. Church, defendant's resident engineer, or by Mr. Wallace, defendant's field engineer, that all work required under plaintiff's subcontract with Peterson had been accomplished to the satisfaction of defendant's inspection force. However, the evidence does not disclose that either Church or Wallace told plaintiff that all of the work called for in the subcontract was performed satisfactorily.

Upon receipt of the $5,000 check, Peterson removed his equipment and his employees from the job. Thereafter some further excavating was required of plaintiff which he performed with his own employees.

The plaintiff ultimately received the sum of $63,881.92 on account of excavation for canal at the bid price of 32 cents per cubic yard on a quantity of 199,631 cubic yards. By the end of July the best record of excavation then performed showed that Peterson had excavated 196,-610 cubic yards of earth. This would indicate that between August 1, 1952 and the end of the work the plaintiff excavated about 3,000 yards of earth.

The evidence further shows that the plaintiff was negligent, not only in fail-

ing to employ some system of quality control on the work of his workmen, particularly those engaged in laying and joining pipe, but he was also negligent in failing to test each siphon promptly as required by the specifications. The evidence further shows that during the performance of the contract, the plaintiff made no attempt to maintain any record of the cost of siphon repair.

It is also clear from the evidence that due to poor workmanship the plaintiff was put to considerable expense in repairing at least 40 siphons, but the evidence is not satisfactory as to amount. The fact of poor workmanship was at least partially admitted by plaintiff in his claim letter to defendant wherein he stated "the contractor freely acknowledges that a portion of the initial repair work that was necessary on the siphons here involved was his own responsibility and was the result of inexperience and poor workmanship."

In accomplishing the work of laying the pipe for the various siphons, the plaintiff did not follow the requirements of the specifications in that he did not test the siphons for leakage until 40 siphons had been constructed. The plaintiff would not test the siphons until canal water was available. In May, 1952 it was possible to get canal water to 26 of the 40 siphons which had then been constructed. All 26 failed the test as they leaked and leaked badly. It appears that shortly thereafter the balance of 14 were tested and they too leaked and failed the test.

On July 31, 1952 the plaintiff requested another extension of time of 60 days because of the substantial rearrangements in work schedule and redistribution of crews and equipment occasioned by the Bureau of Reclamation's revision of its prior list relating to laterals where water was needed for irrigation. The rearrangement in work scheduling had been made necessary because it was clear to all concerned that the plaintiff would not meet the August 1, 1952 completion date. The plaintiff was advised that seven laterals had been made available for

beneficial use during July and that six additional laterals would be so made available by August 4. There had been much correspondence back and forth between the plaintiff and the defendant's construction engineer in which the Bureau of Reclamation complained of the slow progress of the work and of its need for irrigation water from the laterals.

On April 30, 1952 and May 5, 1952 the acting construction engineer wrote to the plaintiff urging that the plaintiff increase his forces and complete as many laterals as possible immediately so that they might be used for irrigation.

On May 7, 1952 plaintiff wrote the acting construction engineer that all but one lateral would be ready by June 15, 1952.

On June 23, 1952 the construction engineer was advised by his superiors that progress on the contract was not satisfactory, and that the bonding company was being advised that consideration was being given to termination of the contractor's right to proceed. On the afternoon of June 25, 1952 the chief construction engineer and Mr. Boyce, the construction engineer (contracting officer's representative), together with the president and the secretary of the irrigation district, met with Mr. Hellander and a representative of the contractor's surety. Mr. Hellander was there advised that with his present force and equipment it did not appear that he would finish the work by August 1, 1952 in time for the 1952 irrigation season. The surety's representative was advised at this meeting that if it did not take measures to expedite the work, defendant would terminate plaintiff's right to proceed. Soon thereafter the surety sent its representatives to Superior and the contract work was completed under the joint supervision of plaintiff and an engineer from the surety company.

On July 3, 1952 the construction engineer was advised by his superiors that after the system of laterals was available for beneficial use, liquidated damages need not be assessed.

The need for siphon repair of at least 40 of the 52 siphons became evident in May of 1952. The plaintiff performed no siphon repair of any consequence until about the middle of October. Of course there was other work being accomplished by the plaintiff but the plaintiff was urged to augment his forces to repair as many of the siphons as possible so that the farmers might be provided with irrigation water for the 1952 growing season. Despite this no repair of siphons took place until October 17. By arrangement between the plaintiff and the defendant a majority of the laterals were used intermittently between July 13 and September 15, 1952.

The work under the contract was accepted as complete for beneficial use on September 23, 1952.

Mr. Boyce repeatedly urged the plaintiff to augment his work forces to enable the work to move along at a faster rate, particularly since the repair of siphons had become a major item.

By September 30, 1952 only eight of the 52 siphons had been completed and found acceptable after passing the leakage test. On that day, Mr. Boyce urged the plaintiff to increase his work force of 11 men so that the contract might be completed before the ground froze that winter.

On October 31, 1952 the contracting officer issued formal findings of fact which granted the plaintiff an additional 53 calendar days' extension of time for completion of the work. This extended the contract completion date to September 23, 1952. By letter of transmittal, the plaintiff was notified of his right of appeal if such findings of fact were unsatisfactory to him. The plaintiff replied that the findings of fact were satisfactory.

On January 20, 1953 the plaintiff requested a further extension of time for completion of the work to and including December 1, 1952. This extension was not given. Since no liquidated damages were finally assessed against the plaintiff, the failure to grant the extension of time did not adversely affect the plaintiff.

The repair of the siphons was an extensive operation. Practically all of the work of siphon repair was performed by the plaintiff between October 17, 1952 and January 12, 1953. During this period the plaintiff had an average of 12 workmen on the job. They were not entirely, though largely, engaged in siphon repair. As to the 18-inch siphons, it was necessary to remove such fill as had been placed above the pipe so that the concrete bands at the pipe joints could be examined and repaired where necessary when leaks appeared. On concrete pipe of the diameter of two feet and more, the repair was accomplished from the inside of the pipe. It was necessary to clean out the pipe before the pipe joints could be either examined or repaired. There was much mud in the pipes that had to be cleaned out. The plaintiff insists that the use by the defendant of laterals for the purpose of serving the farmers was the cause of the deposit of the great quantities of mud in pipe. The plaintiff's evidence is not satisfactory to show this. There is in evidence, as plaintiff's exhibit 3, a chart showing the extent of the use of water from those farm turnouts attached to the various laterals. It does not appear that such use would have deposited the great quantities of mud which the plaintiff had to remove in order to repair the 24-inch and larger pipe. It is found that the mud which had to be removed was deposited in the pipe prior or to such beneficial use by the defendant due primarily to the heavy rainfall.

On February 5, 1953 plaintiff wrote the construction engineer stating that he felt the Bureau of Reclamation should reimburse him for costs of siphon repair because of defective specifications and by reason of the Government's use of most of the siphons prior to final acceptance. Subsequently plaintiff submitted a claim to the contracting officer for additional costs of siphon repair. His claim was asserted under Article 4 of the contract (Latent Conditions Encountered at the

Site Differing Materially from those Indicated in the Specifications).

On March 2, 1953 the construction engineer sent to plaintiff a final payment voucher together with three copies of a release form. The plaintiff was advised that if the final voucher was satisfactory, to sign and return it together with two signed copies of the release.

On March 10, 1953 plaintiff executed a full release without exception of any kind, in consideration of the payment of the amount due on final payment of $21,-044.07. This amount was paid.

The release which is in evidence as defendant's exhibit 21, reads as follows:

"Whereas, by the terms of a contract dated March 5, 1951, (Symbol No. 12r–19373), entered into by the United States of America, represented by W. E. Blomgren, Acting Chief Engineer, Bureau of Reclamation, Denver, Colorado, and Thomas A. Hellander, an individual trading as Tom Hellander Company, of the city of Fargo in the State of North Dakota for construction and completion of earthwork and structures for Laterals 3.7, 4.2, 6.2, 9.5, 12.5, 13.9, 14.9, 15.3, 16.3, 17.5, 18.4, 19.9, 21.2, 21.9, 22.6, 23.7, 27.3, 28.3, 28.9, and 29.3, and sublaterals, drains, and channel changes for the Superior Lateral System, Specifications No. DC–3278, Bostwick Division, Missouri River Basin Project, it is provided that: 'Upon completion and acceptance of all work required hereunder, the amount due the contractor under this contract will be paid upon the presentation of a properly executed and duly certified voucher therefor, after the contractor shall have furnished the Government with a release, if required, of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein.'

"Now, Therefore, in consideration of the premises and the payment by the United States to the contractor of the amount due under the contract, to wit, the sum of Twenty-one thousand forty-four and 07/100 dollars ($21,044.07), the contractor hereby remises, releases, and forever discharges the United States of and from all manner of debts, dues, sum or sums of money, accounts, claims, and demands whatsoever, in law and in equity, under or by virtue of the said contract, except *no exceptions*

"In Witness Whereof, the hand and seal of the contractor have been hereunto set this 10 day of March, 1953." [Italics supplied.]

Where the concrete pipe and siphons made an abrupt change in direction vertically, the contract drawings called for and the plaintiff installed cradles at the bend in the pipe. This was a concrete bedding under the bend.

Measurement for payment for cradle excavation was made to the vertical sides of the trench in which the cradle was poured. Since this same method was used in measuring for payment of excavation for pipe, the only additional payment received by the plaintiff for excavation for the 100 cradles which he installed was for the additional excavation into which the cradle was poured. This amounted to about eight inches under the bend of the pipe extending for its width 12 inches on each side of the bend for the length of the cradle. No wooden forms were used by the plaintiff in pouring the concrete for the cradles. This was made possible because of the nature of the soil which permitted trimming to vertical lines.

On March 26, 1952 plaintiff wrote the acting construction engineer protesting the action of the Bureau of Reclamation in failing to measure and pay for the structural excavation for concrete cradles on the basis of one foot horizontal and then up on a 1–2–1 slope.

By letter of August 8, 1952 plaintiff was advised by the construction engineer that payment for excavation and backfill for concrete cradles would be made only to the lines and dimensions to which plaintiff had actually excavated.

On September 23, 1952 the plaintiff wrote to Mr. Boyce's superior, Mr. Grant Bloodgood, Chief of Construction, Bureau of Reclamation, Denver, Colorado, in which plaintiff further discussed his claim for additional excavation for cradles. He suggested that he would prefer to maintain the correspondence on the subject outside of the prescribed procedure generally applicable to formal claims since it related to contract interpretation.

On December 11, 1952 the contracting officer affirmed his decision as to measurement for payment of excavation for cradles and advised the plaintiff that if he desired to further pursue his claim, an exception might be made on the release on the contract and the matter would be considered in findings of fact. As noted previously, no exception was taken by the plaintiff when he executed the release on final payment.

The pertinent provisions of the contract and specifications are set forth in the findings of fact.

The defendant's arguments in answer to all of plaintiff's claims are: (1) the release executed by plaintiff discharged the United States from any and all claims and demands in law and equity; (2) absent the release there is no liability, legal or equitable, because of plaintiff's failure to exhaust his administrative remedies; and (3) there is no liability because on the merits plaintiff's claims are without foundation.

All three of the above defenses are meritorious, as will be obvious from the following discussion.

Plaintiff's contract contained a provision known as Article 16(d) which provided:

"Upon completion and acceptance of all work required hereunder, the amount due the contractor under this contract will be paid upon the presentation of a properly executed and duly certified voucher therefor, after the contractor shall have furnished the Government with a release, if required, of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein."

As previously noted, plaintiff did sign a full release and noted no' exceptions of any kind therein. Plaintiff, in his exceptions to the findings of fact on this subject, apparently seeks to be excused from the signed release for the reason he signed, without noting an exception, on the advice of Senator Langer, an attorney at law, upon his assurance that doing so would not make any difference in the matter of the claim which would be taken care of through congressional channels. Secondly, plaintiff says that appeals under the administrative process would be decided or influenced by persons with whom the dispute was originally had, and therefore would have availed him nothing.

We have not allowed the plaintiff's exceptions for these reasons. The established legal remedy and the only avenue for relief lies in pursuit of administrative remedies provided they are adequate. United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 823, 88 L.Ed. 1039. In this respect there is no basis for a finding that the administrative remedies were not adequate. The Supreme Court has expressly approved the administrative remedies available in Government contracts and has not been moved by the suggestion that the remedies would be influenced by persons with whom the dispute was originally had. In fact the Supreme Court in the Blair case, supra, used this language:

"Even if the conduct of the Government superintendent or contracting officer, or their assistants, was so flagrantly unreasonable or so

grossly erroneous as to imply bad faith, the appeal provisions of the contract must be exhausted before relief is sought in the courts."

Therefore when the release was signed without exception, plaintiff is bound thereby and the United States is discharged from all claims and demands in law and equity arising out of the contract. P. J. Carlin Construction Company v. United States, 92 Ct.Cl. 280, 304; A. L. Coupe Construction Company v. United States, 134 Ct.Cl. 392, 398, 139 F.Supp. 61.

Defendant's second argument is that plaintiff failed to exhaust his administrative remedies. This is discussed above and the only additional discussion necessary is that the first four claims which arose under the contract involved questions of fact. Article 15 of the contract, entitled Disputes, provided:

"Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed."

Thus, when plaintiff claimed certain additional costs, which claims were denied, he thereby invoked the Disputes clause and failing to appeal, the decision of the contracting officer became final and conclusive upon the parties. It is clear that plaintiff, in order to exhaust his administrative remedies, was required to appeal the rulings of the contracting officer. Since plaintiff failed to exhaust his administrative remedies on claims 1, 2, and 3, his fifth claim, tied to the first three, must also fail.

Finally we are of the opinion that the Government is correct when it argues that all of plaintiff's claims should fail on the merits.

As to claim 1, plaintiff admits that at least a portion of the repair work that was necessary was his own responsibility due to inexperience and poor workmanship. Furthermore, the facts show that plaintiff was negligent in failing to employ some system of quality control on the work of his workmen, particularly those engaged in laying and joining pipe, and was also negligent in failing to test each siphon promptly as required by the specifications. Moreover, the evidence discloses that the expense plaintiff was put to on at least 40 siphons was due to poor workmanship. Just as important, plaintiff failed satisfactorily to evidence the amount of said costs. In addition the facts show that the accumulation of mud deposits in the pipe prior to beneficial use was due primarily to heavy rainfall rather than by use of the Government. As a matter of fact, plaintiff was given time extensions which adequately compensated him for the delays, inasmuch as no liquidated damages were assessed or paid.

Even considering that defendant did partially use the system before completion, plaintiff was put to no additional expense by reason thereof. Consideration was given to termination of the contractor's right to proceed because it appeared that the work would not be finished in time for the 1952 irrigation season. The work was finally completed under the joint supervision of plaintiff and an engineer from the bonding company. We can find nothing arbitrary in the Government's insistence that the contract be completed on time or in its ultimate use of the laterals in order to supply irrigation water for the 1952 season. This is especially true inasmuch as when the Government strongly urged that plaintiff speed up his work, plaintiff promised that all laterals except one would be completed and ready by June 15, 1952.

As to claim 2, under special provision B–7 of the contract plaintiff was obligated to bear the costs of maintaining

the excavations during construction. As noted earlier, the evidence fails to disclose that any assurance was ever given plaintiff by defendant that the work of the subcontractor was complete and satisfactory. Therefore any work done was either in repair or in completing the work of the subcontractor which was the obligation of plaintiff under the contract, and was not a reconstruction or recompletion as the plaintiff terms it.

Plaintiff's third cause of action also fails in proof. The findings show that delays because of weather were compensated for by the granting of time extensions. This also was provided for in the contract. Also as noted earlier, plaintiff was assessed no liquidated damages because of delays which could have accrued at the rate of $100 per day from September 23, 1952 to February 13, 1953.

Plaintiff's fourth cause of action is for cradle excavations. Plaintiff says he was required, in the performance of the contract, to excavate trenches for pipeline cradles with sides of varying slopes, varying from vertical to a slope of as much as 6 to 1. Plaintiff was paid on the basis of one foot horizontal and then up on a 1–2–1 slope.

Here again plaintiff must fail on the merits. The third proviso of special provisions B–7 of the contract provides:

" * * * that where the character of the material cut into is such that it can be trimmed to the required lines of the concrete structure and the concrete placed against the sides of the excavation without the use of intervening forms, payment will be made only for the excavation within the neat lines of the structures; * * *."

On August 8, 1952 plaintiff was advised by defendant that the lines and dimensions to which plaintiff had actually excavated for the cradles "are established as the lines and dimensions to which measurement for payment of excavation and backfill will be made." An identical situation arose in the case of Dunn v. United States, 100 Ct.Cl. 440.

In that case the defendant urged that the contracting officer, by using actual excavation to steep slopes as the basis for his measurement for monthly estimates, did otherwise establish a basis of measurements for the payment within the meaning of the specifications and that the specifications did not require that a different basis of measurement for payment should be established before any of the work was done. The court agreed with this and held that plaintiff was not entitled to recover. Incidentally, in this respect the specifications in the Dunn case are identical to the specifications in the instant case. Consequently, under the terms of the proviso quoted above the manner of measuring for payment was correct.

Plaintiff's fifth cause of action must also fail on the merits. All the work done including repair was called for by the contract. Obviously no profit could have been anticipated because plaintiff was forced to make repairs and do work contemplated under the contract. Nor is plaintiff entitled to any profit because of damage caused by rains. As noted previously he was granted time extensions under the contract and was assessed no liquidated damages. Any profit plaintiff was entitled to was reflected in the bid price.

In conclusion, plaintiff's execution of a release without exception discharged the United States from any claims or demands, in law and equity, arising out of the contract between the parties. Further, plaintiff is barred from recovery because he has failed to exhaust his administrative remedies. Finally, in any event, plaintiff's claims are without foundation on the merits.

This opinion, together with the findings of fact, will be certified to Congress pursuant to Senate Resolution 247, agreed to on April 30, 1956.

FAHY, Circuit Judge, sitting by designation; JONES, Chief Judge, LITTLETON, Judge (Ret.), and WHITAKER, Judge, concur.

## Findings of Fact

The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:

1. The plaintiff, Thomas A. Hellander, is an individual, trading as Tom Hellander Company, whose principal place of business is located at 1040 Judson Street, Lincoln, Nebraska.

2. This action was filed pursuant to Resolution 247 of the United States Senate, agreed to on April 30, 1956. The resolution referred a Senate bill and directs this court to report findings of fact and conclusions as shall be sufficient to inform the Congress of the nature and character of the demand of the plaintiff's company as a legal or equitable claim, and the amount, if any, legally or equitably due from the United States to the claimant.

3. By contract No. I2r–19373, entered into on March 5, 1951 between the plaintiff and the United States, acting through the acting chief engineer, Bureau of Reclamation, Department of the Interior, the plaintiff agreed to construct earthwork and structures for laterals, sublaterals, drains and channel changes for the Superior Lateral System on the Superior-Courtland Unit, Bostwick Division, Nebraska-Kansas Missouri River Basin Project. The contract was based upon unit prices for a total estimated consideration of $234,547. The United States Guarantee Company, a New York corporation, executed the usual performance and payment bonds as plaintiff's surety.

The work covered by the contract included the following principal components:

"1. Excavation and earthwork of approximately 27 miles of earth section for laterals.

"2. Excavation and earthwork for approximately 2 miles of drains and channel changes.

"3. Earthwork and construction for structures, including flumes, culverts, division boxes, turnouts, checks, drops, chutes, and concrete pipe siphons, road crossings, and railroad crossings.

"4. Excavation and earthwork for approximately 0.1 mile of county road relocation.

"5. Application of fertilizer on approximately 25 acres of lateral banks, spoil banks and banks of drain ditches.

"6. Seeding of approximately 80 acres of lateral banks, spoil banks, and banks of drain ditches."

4. The plaintiff was given notice to proceed by letter of March 20, 1951. Such notice was effective upon its receipt a day or two later.

5. The work was to be commenced within 30 days after receipt by the plaintiff of the notice to proceed, and was to be completed within 300 calendar days from the date of receipt of such notice. Time between December 1 and March 15 was to be excluded in such computation if the time for completion, including extensions of time granted, extended into such period.

6. By the terms of the contract no material was to be furnished by the defendant.

7. The plaintiff was awarded the contract in suit as a result of competitive bids. Four bids, including the plaintiff's, were received. The totals of such bids along with the total of the Government estimate are shown below:

Government Estimate ...... $284,708.00
Tom Hellander Co. ........ 234,547.00
Claussen-Olson-Benner,
   Inc. ................... 296,093.00
United Engineers, Inc. .... 324,965.00
Ace Construction Co. ...... 458,658.70

8. The contract contained the following provisions, among others:

" * * * Article 3. *Changes.*— The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and

within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No change involving an estimated increase or decrease of more than Five Hundred Dollars shall be ordered unless approved in writing by the head of the department or his duly authorized representative. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: *Provided, however*, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.

\*    \*    \*    \*    \*

"Article 5. *Extras.*—Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order.

"Article 6. *Inspection.*—(a) All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by Government inspectors at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Government shall have the right to reject defective material and workmanship or require its correction. Rejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the contractor shall promptly segregate and remove the rejected material from the premises. If the contractor fails to proceed at once with the replacement of rejected material and/or the correction of defective workmanship the Government may, by contract or otherwise, replace such material and/or correct such workmanship and charge the cost thereof to the contractor, or may terminate the right of the contractor to proceed as provided in article 9 of this contract, the contractor and surety being liable for any damage to the same extent as provided in said article 9 for terminations thereunder.

"(b) The contractor shall furnish promptly without additional charge, all reasonable facilities, labor, and materials necessary for the safe and convenient inspection and test that may be required by the inspectors. All inspection and tests by the Government shall be performed in such manner as not unnecessarily to delay the work. Special, full size, and performance tests shall be as described in the specifications. The contractor shall be charged with any additional cost of inspection when material and workmanship is not ready at the time inspection is required by the contractor.

"(c) Should it be considered necessary or advisable by the Government at any time before final acceptance of the entire work to make an examination of work already completed, by removing or tearing out same, the contractor shall on request promptly furnish all necessary facilities, labor, and material. If such work is found to be defective in any material respect, due to fault of

the contractor or his subcontractors, he shall defray all the expenses of such examination and of satisfactory reconstruction. If, however, such work is found to meet the requirements of the contract, the actual cost of labor and material necessarily involved in the examination and replacement, plus 15 percent, shall be allowed the contractor and he shall, in addition, if completion of the work has been delayed thereby, be granted a suitable extension of time on account of the additional work involved.

"(d) Inspection of material and finished articles to be incorporated in the work at the site shall be made at the place of production, manufacture, or shipment, whenever the quantity justifies it, unless otherwise stated in the specifications; and such inspection and acceptance, unless otherwise stated in the specifications, shall be final, except as regards latent defects, departures from specific requirements of the contract and the specifications and drawings made a part thereof, damage or loss in transit, fraud, or such gross mistakes as amount to fraud. Subject to the requirements contained in the preceding sentence, the inspection of material and workmanship for final acceptance as a whole or in part shall be made at the site.

\*        \*        \*        \*        \*

"Article 8. *Superintendence by contractor.*—The contractor shall give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the contracting officer, on the work at all times during progress, with authority to act for him.

"Article 9. *Delays—Damages.*— If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any ex-

tension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby. If the contractor's right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event it will be impossible to determine the actual damages for the delay and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: *Provided,* That the right of the contractor to proceed shall not be terminated or the contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Government, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10

days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.

"Article 10. *Permits and responsibility for work.*—The contractor shall, without additional expense to the Government, obtain all required licenses and permits and be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work, and shall be responsible for all materials delivered and work performed until completion and final acceptance. Upon completion of the contract the work shall be delivered complete and undamaged.

\*     \*     \*     \*     \*

Article 15. *Disputes.*—Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned ·or his duly authorized representative, whose decision shall be final and conclusive upon the par-

ties thereto. In the meantime the contractor shall diligently proceed with the work as directed.

"Article 16. *Payments to contractors.*—\*  \*  \* (d) Upon completion and acceptance of all work required hereunder, the amount due the contractor under this contract will be paid upon the presentation of a properly executed and duly certified voucher therefor, after the contractor shall have furnished the Government with a release, if required, of all claims against the Government arising under and by virtue of this contract, other than such claims, if any, as may be specifically excepted by the contractor from the operation of the release in stated amounts to be set forth therein. \*  \*  \*"

9. The Special Provisions provide in part as follows:

"\*  \*  \* 7. *Commencement, prosecution, and completion of work.* The contractor shall begin work within thirty (30) calendar days after date of receipt of notice to proceed and shall complete all of the work within three hundred (300) calendar days from the date of receipt of such notice: *Provided,* That for purposes only of determining the final date for completion, the time between December 1 and March 15, inclusive, shall be excluded if the contract time for completion of the work hereunder, including any extension of time granted pursuant to article 9 of the contract, extends into or includes any part of the period from December 1 to March 15; *Provided further,* That the period allowed for the completion of the work shall be reduced by one (1) calendar day for each calendar day of delay in excess of ten (10) calendar days, or any extension thereof, in returning properly executed contract and performance and payment bonds as required in United States Standard

Form No. 21 (rev. 4/6/50). The Government will make final acceptance of laterals prior to completion of all work under the contract, upon completion of all earthwork, structures and seeding for a lateral, including all sublaterals on the lateral, as required under these specifications: *Provided,* That 10 percent of the estimate for the accepted work will be retained until completion and final acceptance of all work covered by the contract, subject to the provisions of article 16(b) of the contract. Delays due to operations by the Government of a national priorities or material allocation system where such operations become effective subsequent to the date bids are opened, will be considered to be excusable delays arising out of causes beyond the control and without the fault or negligence of the contractor. The capacity of the contractor's construction plant, sequence of operation, method of operation, and the forces employed shall, at all times during the continuance of the contract, be subject to the approval of the contracting officer and shall be such as to insure the completion of the work within the specified period of time.

8. *Liquidated damages.* The contractor shall pay to the Government, as fixed, agreed, and liquidated damages, the sum of one hundred dollars ($100) per day for each calendar day's delay.

\* \* \* \* \* \*

"B-7. *Excavation for structures.* The item of the schedule for excavation for structures includes all required excavation for the structures between vertical planes at the upstream and downstream ends of the concrete structures or combinations of adjoining concrete structures. *Provided,* That at bridge abutments or footings, turnouts, drainage inlets, overchutes, and other structures lying largely outside of the canal prism, the item of the schedule for excavation for structures includes only the required excavation outside of the normal canal prism: *Provided further,* That where the construction of a drainage culvert or irrigation crossing under the canal prism precedes the excavation of the canal prism at the site of the structure, all required excavation for the structure will be paid for as excavation for structures. Except for the limitations described above, excavation for structures will generally be measured for payment to lateral dimensions 1 foot outside of the foundations of the structures and to slopes of 1 to 1 for common or unclassified excavation and ¼ to 1 for rock excavation: *Provided,* That where the character of the material cut into is such that it can be trimmed to the required lines of the concrete structure and the concrete placed against the sides of the excavation without the use of intervening forms, payment will be made only for the excavation within the neat lines of the structures: *Provided further,* That for any structure where conditions warrant, the excavation will be measured for payment to the most practicable dimensions and lines as staked out or otherwise established by the contracting officer. Trenches for pipe shall be excavated to the lines and grades shown on the drawings or established by the contracting officer. The contractor will not be required to excavate the trenches to vertical sides, but regardless of the side slopes and the widths of trenches as actually excavated, measurement for payment of the excavation for pipe trenches will be made to the widths shown on the drawings, to vertical sides, and to the depths shown on the drawings or prescribed by the contracting officer, and no allowance will be made for additional excavation required for bell holes. If the material in the bottom of the trench is not suitable, as determined by the contracting

officer, for a foundation for the pipe, the unsuitable material shall be removed to such a depth as may be directed by the contracting officer and the material removed below the bottom of the pipe shall be replaced with selected material and compacted to the satisfaction of the contracting officer, or if water is encountered, shall be replaced with ⁹⁄₁₆-inch to 1½-inch gravel or crushed rock, the gradation of which shall be directed by the contracting officer but in all cases shall be such as to insure adequate bedding conditions for the structure. Measurement for payment for required additional excavation and refill of pipe trenches will be made to the lines and depths prescribed by the contracting officer. If selected earth material is required, payments will be made at the unit prices bid in the schedule for excavation for structures, backfill, and compacting backfill. If gravel or crushed rock material is required, payments will be made at the unit prices bid in the schedule for excavation for structures and for furnishing and placing gravel or crushed rock bedding material in pipe trenches, and for pockets at weep holes. The quantity of gravel or crushed rock material stated in the schedule is an estimate for the purpose of comparing bids and the contractor shall be entitled to no additional compensation above the unit price bid in the schedule by reason of a larger quantity or none being required. The contractor shall prepare the foundations at structure sites in a manner suitable for forming foundations for the concrete structures. The bottom and side slopes of common excavation, upon or against which concrete is to be placed, shall be finished accurately by hand to the dimensions shown on the drawings or prescribed by the contracting officer, and the surfaces so prepared shall be moistened and tamped with suitable tools for the purpose of thoroughly compacting them and forming firm foundations upon or against which to place the concrete structures. If at any point in common excavation the foundation material is excavated beyond the neat lines required to receive the structure, the overexcavation shall be filled with selected materials, in layers not more than 6 inches thick, moistened and thoroughly compacted by tamping to a degree satisfactory to the contracting officer. If at any point in common excavation, the natural foundation material is disturbed or loosened during the excavation process or otherwise, it shall be consolidated to a degree satisfactory to the contracting officer, or, where directed by the contracting officer, it shall be removed and replaced with selected material and compacted in a manner approved by the contracting officer. Where concrete is to be placed upon or against rock, the excavation shall be sufficient to provide for the minimum thickness of concrete at all points and the prescribed thickness shall be exceeded as little as possible. Measurement of such excavation for payment will be limited to the excavation required for the prescribed thickness of the concrete. Any and all excess excavation or overexcavation performed by the contractor for any purpose or reason except as may be ordered in writing by the contracting officer, and whether or not due to the fault of the contractor, shall be at the expense of the contractor. Any damage done to the work by blasting, including the shattering of the material beyond the required excavation lines, shall be repaired by and at the expense of the contractor and in a manner satisfactory to the contracting officer. All cavities in rock excavations, upon or against which concrete is to be placed, caused by careless excavation,

as determined by the contracting officer, or by removal, as directed by the contracting officer, of rock or other foundation materials needlessly damaged by blasting or other operations of the contractor shall be filled solidly with concrete entirely at the expense of the contractor, including the cost of all materials required therefor. Insofar as practicable, the material moved in excavation for structures shall be used for backfill and embankments or shall be wasted as directed by the contracting officer. The unit prices bid in the schedule for excavation for structures shall include the cost of all labor and materials for cofferdams and other temporary construction, and of all pumping, bailing, draining, and all other work necessary to maintain the excavations in good order during construction, and of removing such temporary construction, where required, and shall include the cost of disposing the excavated material except that required overhaul will be paid for as provided in paragraph B–17. * * "

10. The Standard Specifications for Construction of Canal Systems reads in part as follows:

"C–1. *Construction of structures.* The structures to be constructed will be listed in the Special Provisions."

The Special Provisions provide in part as follows:

"C–1. (Construction of structures.) The structures to be constructed under these specifications will include Parshall flumes, culverts, division boxes, turnouts, checks, drops, chutes, siphons, road crossings, and railroad crossings.

\* \* \* \* \* \*

"C–6. * * * Concrete cradles and thrust blocks shall be provided on reinforced-concrete pipe siphons where 3 or more 7½-degree elbow units are required. At any bend where the foundation conditions are unsatisfactory, as determined by the contracting officer, a concrete encasement shall be provided. Concrete cradles, thrust blocks, and encasements shall be constructed in accordance with Drawing No. 65 (X–701–31)."

11. The contract specifications as respects materials to be furnished by the contractor read, in part, as follows:

"The contractor shall furnish * * * water * * * for testing siphons and pipe lines."

12. The provisions of the specifications as to testing of siphons are as follows:

"* * * C–5 *Testing monolithic-concrete siphons.* After each siphon has been otherwise completed and before backfill is placed around the barrel, it shall be tested for strength and watertightness by being filled with water to the elevation of the floor at the downstream end of the outlet. Testing under full operating head will not be required. After being filled to the required elevation, the water surface shall be maintained at that elevation for a period of 24 hours. The total amount of leakage from the siphon during this 24-hour period shall not, in the opinion of the contracting officer, be excessive, and no individual leaks will be permitted that, in the opinion of the contracting officer, might endanger the structure or damage the foundation or backfill around the structure when completed. The contractor shall do all calking and make all repairs, to the satisfaction of the contracting officer, that are necessary to secure the required watertightness. Water for making the tests will be furnished by the Government.[1] The tests shall be made as soon after the completion of

---

[1] Note.—This sentence superseded by the provision quoted in preceding finding requiring the contractor to furnish water for testing siphons and pipelines.

the construction of the siphon barrel as practicable, as determined by the contracting officer, and when water therefor is available, but in no event within less than 30 days after the placing of any concrete that will be subjected to hydrostatic pressure during the tests. The Government will not be responsible for any damage to the structures, or otherwise, due to testing. The cost of furnishing all labor and materials, except water, required in making the tests shall be included in the unit price bid in the schedule for concrete in structures. The contractor will be required to test the siphons and the work will not be considered completed until such testing has been performed, unless a written waiver of the requirements for testing is issued by the contracting officer. If the requirements for testing are waived, the contractor shall calk and repair all cracks which, in the opinion of the contracting officer, need to be calked or repaired to secure the required watertightness.

  *  *  *  *  *  *

"C-6. (c)(5)(d) Testing pre-cast-concrete pipe lines.—After a pre-cast-concrete pipe siphon or other section of pipe line that will operate under hydrostatic pressure has otherwise been completed, such pipeline sections shall be tested for strength and watertightness. Tests shall be made as soon after completion of construction of the pipe line as practicable, as determined by the contracting officer, and when water therefor is available, but in no event sooner than 20 days after the completion of any joint in the section of pipe line to be tested. Water for making the tests will be furnished by the contractor. Testing under full operating head will not be required. Tests shall be made by filling with water to the elevation of the invert at the downstream outlet or by other methods as directed by the contracting officer. After the pipe line has been filled to the specified elevation, the water surface shall be maintained at that elevation for a period of 24 hours. The total amount of leakage during this 24-hour period shall not exceed 200 gallons per inch of internal pipe diameter per mile of pipe line, and no individual leak will be permitted that, in the opinion of the contracting officer, might endanger the pipe line or damage the foundation or the backfill around the pipe line. If the leakage exceeds 60 percent of the maximum permitted, the water surface shall be maintained at the specified elevation for a period of 30 days, to permit evidence of excessive leakage at any point to become apparent. The contractor shall make all repairs and/or replacements, that in the opinion of the contracting officer, are necessary to secure the required watertightness. The Government will not be responsible for any damage to the pipe lines, or otherwise, due to testing. The contractor shall provide all labor, equipment, and materials required in making the tests, and the cost thereof shall be included in the unit prices bid in the schedule for furnishing and laying concrete pipe. * * *"

13. The contract work involved much earthwork and grading, which the plaintiff subcontracted to Harley O. Peterson. The laying of precast concrete pipe was also a major part of the work, as 52 siphons of varying size and length were involved. The pipe size varied from 18-inch diameter to 30-inch diameter. The system of laterals when finished was to irrigate farmlands in the vicinity of Superior, Nebraska. The work extended over a lineal distance of 24 miles along the Superior Canal from a point about two miles west of Guide Rock, Nebraska to Hardy, Nebraska.

14. Prior to undertaking the contract in suit plaintiff had had no experience in laying and joining precast concrete pipe

designed to support hydrostatic pressure. His only other construction experience with laying concrete pipe was in connection with the installation of a few hundred feet of culvert pipe, and, on that job, he subcontracted such work. On the contract in suit there was a total of 1753 feet of 18-inch, 3367 feet of 24-inch, and 1381 feet of 30-inch concrete pipe laid. Prior to bidding on the contract, plaintiff made no study, nor did he otherwise inquire as to the experience of other contractors on similar construction.

15. The initial operations of the plaintiff were severely impeded by rainfall which was above normal at Guide Rock, Nebraska each month during the year 1951, except for the months of November and December. For the months of June and July rain was particularly heavy, with 6.53 inches above normal in June, and 3.17 inches above normal in July.

16. Due to the inclement weather the plaintiff requested an extension of time as early as July 7, 1951, and again on March 26, 1952 and May 7, 1952. On June 10, 1952 the contracting officer issued formal findings of fact, pursuant to article 9 of the contract in which he concluded, after detailing the extent of rainfall, and the interruption to the plaintiff's work occasioned by it, that the plaintiff was delayed 90 days in the completion of the work. The time for performance was accordingly extended to August 1, 1952. The findings of fact referred to above were transmitted to the plaintiff by letter of June 13, 1952. The plaintiff was advised of the right of appeal if such findings of fact were unsatisfactory. On June 21, 1952 the plaintiff wrote to the acting construction engineer stating that the findings of fact were satisfactory. No liquidated damages were finally assessed against or paid by the plaintiff.

17. Apparently the work of the plaintiff's subcontractor, Harley O. Peterson, proceeded satisfactorily to the plaintiff, and generally satisfactory to the defendant's field inspectors. This work was interrupted by the excessive rains in the late spring but Peterson proceeded with his work when weather permitted. On July 19, 1952 the plaintiff paid Mr. Peterson the sum of $5,000 by check. The plaintiff contends that prior to this payment he had been given oral assurance by either Mr. Church, the defendant's resident engineer or by Mr. Wallace, the defendant's field engineer, that all work required under the plaintiff's subcontract with Peterson had been accomplished to the satisfaction of the defendant's inspection force. Upon receipt of the $5,000 check, Peterson removed his equipment and his employees from the job. Thereafter some further excavation was required of plaintiff which he performed with his own employees.

18. The plaintiff ultimately received the sum of $63,881.92 on account of excavation for canal at the bid price of 32 cents per cubic yard on a quantity of 199,631 cubic yards. By the end of July the best record of excavation then performed showed that Peterson had excavated 196,610 cubic yards of earth. This would indicate that between August 1, 1952 and the end of the work the plaintiff excavated about 3,000 yards of earth.

19. The plaintiff's testimony is not convincing that either Mr. Wallace or Mr. Church told him that all of the work called for in Peterson's subcontract was performed satisfactorily by July 19, 1952. Neither individual was a contracting officer, as the plaintiff knew. Both of these individuals testified. It was their testimony that no assurance was given to the plaintiff by either as to Peterson's having completed all excavation on or about July 19, 1952. Their testimony is accepted as true. It is found that no assurance was made to or relied upon by the plaintiff concerning the completion of all earth excavation by July 19, 1952. The inspectors checking the work of Peterson as he proceeded would indicate by the placing of laths where additional excavation or where additional fill was needed. When these were called to Peterson's attention, by Mr. Wallace, Peterson told Mr. Wal-

lace that the plaintiff would take care of the additional excavation and fill.

20. The plaintiff had no system of quality control on the work of his men who were engaged in the laying and joining of the pipe sections. He relied entirely upon such inspection as was performed by the resident and field inspectors of the Bureau of Reclamation who were assigned by the contracting officer.

The plaintiff testified in answer to the following:

"Q. You didn't test them as you went along yourself? A. No; it was my assumption that as long as the siphons were in the ground, and that they were acceptable as they were being built in accordance with the specifications, that they would hold water, I took a lot for granted there but that was my thinking there at the time."

21. In accomplishing the work of laying the pipe for the various siphons, the plaintiff did not follow the requirements of the specifications quoted in finding 12 in that he did not test the siphons for leakage until 40 siphons had been constructed. The plaintiff would not test the siphons until canal water was available. In May 1952 it was possible to get canal water to 26 of the 40 siphons which had then been constructed. All 26 failed the test as they leaked and leaked badly. It appears that shortly thereafter the balance of 14 were tested and they too leaked and failed the test.

22. The plaintiff was negligent, not only in failing to employ some system of quality control on the work of his workmen, particularly those engaged in laying and joining pipe, but he was also negligent in failing to test each siphon promptly as required by the specifications.

23. On July 31, 1952 the plaintiff requested another extension of time of 60 days because of the substantial rearrangements in work schedule, and redistribution of crews and equipment occasioned by the Bureau of Reclamation's revision of its priority list relating to laterals where water was needed for irrigation. [The rearrangement in work schedule had been made necessary because it was clear to all concerned that the plaintiff would not meet the August 1, 1952 completion date.] The plaintiff also advised that seven laterals had been made available for beneficial use during July and that six additional laterals would be so made available by August 4. There had been much correspondence back and forth between the plaintiff and the defendant's construction engineer in which the Bureau of Reclamation complained of the slow progress of the work and of its need for irrigation water from the laterals.

24. On June 23, 1952 the construction engineer was advised by his superiors that progress on the contract was not satisfactory, and that the bonding company was being advised that consideration was being given to termination of the contractor's right to proceed. On the afternoon of June 25, 1952 the chief construction engineer and Mr. Boyce, the construction engineer (contracting officer's representative), together with the president and the secretary of the irrigation district, met with Mr. Hellander and a representative of the contractor's surety. Mr. Hellander was there advised that with his present force and equipment it did not appear that he would finish the work by August 1, 1952, in time for the 1952 irrigation season. The surety's representative was advised at this meeting that if it did not take measures to expedite the work, defendant would terminate plaintiff's right to proceed. Soon thereafter the surety sent its representatives to Superior and the contract work was completed under the joint supervision of plaintiff and an engineer from the surety company.

On July 3, 1952 the construction engineer was advised by his superiors that after the system of laterals was available

for beneficial use, liquidated damages need not be assessed.

25. As early as March 24, 1952 the acting construction engineer advised the plaintiff that the contract was about 74.3 percent complete and that little work had been accomplished during March. The plaintiff was directed to place sufficient equipment and forces on the job to insure completion by the scheduled completion date. The plaintiff was further advised that water was needed on May 1, 1952 from the laterals for the purpose of irrigation.

26. On April 4, 1952 the plaintiff was notified by the acting construction engineer that the permissible date for spring seeding was approaching and that any laterals which the plaintiff intended to complete for acceptance should be seeded before April 15 as the contract provided that seeding should be accomplished from February 1 to April 15, or from August 15 to October 1. The suggestion was made that the plaintiff make every effort to complete seeding of as many laterals that spring as possible so that they might be accepted.

27. On April 14, 1952 the plaintiff was advised by the acting construction engineer that the contract required the plaintiff to have a competent foreman or superintendent on the work at all times. He further stated that numerous occasions had arisen in the past which required immediate action by the plaintiff's firm but that there was no one in charge to take action.

28. On April 30, 1952 and May 5, 1952 the acting construction engineer wrote to the plaintiff urging that the plaintiff increase his forces and complete as many laterals as possible immediately so that they might be used for irrigation.

29. On May 7, 1952 the plaintiff wrote the following letter to Mr. R. L. Boyce, acting construction engineer:

"This will acknowledge your letter of May 5, 1952, in which you point out that the scheduled completion date of April 29, 1952, has passed and none of the Laterals are complete, and in which you thereby infer that the contractor is at fault.

"Your attention is invited to the provision in the contract which states that unusually unfavorable weather conditions is a legitimate ground for an extension of time.

"Your attention is also invited to the provision in the contract which states that delays caused by the government and through no fault of the contractor shall be a legitimate basis for an extension of time. Both of the conditions described above have prevailed extensively and nearly continually during the life of this contract. Therefore the contractor is not at fault in the performance of this contract.

"At the present time every effort is being made by the contractor to complete each Lateral as soon as possible. Due to conditions beyond the control of the contractor it is difficult to predict the exact date of completion of each Lateral as requested in your letter. However, it appears reasonably certain that all of the Laterals east of the Lateral 21.2 will be ready by May 15, 1952, and that the remaining Laterals, with the exception of 17.5, of course, will be ready by June 15, 1952."

30. On May 26, 1952 Mr. Boyce replied to the plaintiff's letter of May 7 as follows:

"Reference is made to your letter dated May 7, 1952, in which you state that it appears reasonably certain that all of the laterals east of Lateral 21.2 will be ready by May 15, 1952. None of these laterals have been completed to date. This is in connection with your Superior Lateral Contract I2r–19373 under Specifications No. DC–3278.

"You are hereby instructed to concentrate on the completion of work which is already under way. Addi-

tional structures will not be staked until all repairs are made and suitable progress in completing the laterals east of Lateral 21.2 is demonstrated. An exception will be made in the case of the siphon on Lateral 21.2 at Station 30+94. This structure will be staked so that you can proceed with it at any time."

31. Mr. Boyce repeatedly urged the plaintiff to augment his work forces to enable the work to move along at a faster rate, particularly since the repair of siphons had become a major item.

32. By September 30, 1952 only eight of the 52 siphons had been completed and found acceptable after passing the leakage test. On that day, Mr. Boyce urged the plaintiff to increase his work force of 11 men so that the contract might be completed before the ground froze that winter.

33. On October 31, 1952 the contracting officer issued formal findings of fact which granted the plaintiff an additional 53 calendar days' extension of time for completion of the work. This extended the contract completion date to September 23, 1952. By letter of transmittal, the plaintiff was notified of his right of appeal if such findings of fact were unsatisfactory to him. The plaintiff replied that the findings of fact were satisfactory.

34. On January 20, 1953 the plaintiff requested a further extension of time for completion of the work to and including December 1, 1952. This extension was not given. Since no liquidated damages were finally assessed against the plaintiff, the failure to grant the extension of time did not adversely affect the plaintiff.

35. On February 5, 1953 the plaintiff wrote to Mr. Boyce, the construction engineer, stating that he felt the Bureau of Reclamation should reimburse him for costs of siphon repair since the Government used most of the siphons prior to final acceptance, and because of defective specifications. He advised that he was then in process of getting the necessary cost figures together and would present a claim in the near future.

36. On February 10, 1953 the plaintiff submitted a claim which reads in part as follows:

"In accordance with the provisions of Article 4 of the above-cited contract between the Bureau of Reclamation, acting for and on behalf of the United States government, and Tom Hellander Co., application is hereby made for an adjustment of the price therein specified for the performance of the contract work, to reimburse the contractor for additional costs incurred because of latent conditions encountered at the site differing materially from those indicated in the specifications, and from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications.

"The facts upon which this claim is based have been known to the Bureau and the contractor since midyear of 1952. However, it was impossible at that time to determine the extent to which the contractor's costs of performance would be increased thereby. Now that the contract has been completed, those costs can be accurately ascertained, and are submitted herewith in support of the contractor's claim.

"This application for a price adjustment under the terms of Article 4 of the contract is predicated on two facts, i. e.:

"(1) Between July 13, 1952 and September 15, 1952 the majority of the laterals covered by the contract were used by the Bureau for irrigation purposes. This use was for the government's sole convenience and prior to final acceptance of these laterals. When the government later refused to accept the laterals, without extensive repairs on the

siphons incorporated therein, it was necessary for the contractor to remove large quantities of mud and debris from the siphons in order to make these repairs. The cost of this repair work was substantially higher than it would have been had the government not elected to and directed the use of the laterals for irrigation purposes during the 1952 crop season.

"(2) The specifications for the construction of all of the siphons proved, as the work progressed, to be defective in several very material respects. These defects are set out in the contractor's letter to the Contracting Officer, dated December 18, 1952, and will not be referred to in detail herein. In brief, it can be stated that the method set forth in the specifications for the construction of those siphons was such as to virtually assure that they would not pass the inspection requirements of those same specifications.

"The contractor freely acknowledges that a portion of the initial repair work that was necessary on the siphons here involved was his own responsibility and was the result of inexperience and poor workmanship. However, it is also submitted that the facts clearly demonstrate that less than 25% of the repair expenses incurred are chargeable to such factors, and that at least 75% are chargeable to the changed and unexpected conditions above specified.

"The claim here submitted does not include siphon repair costs which are properly allocable to the contractor's own errors. However, in order to clearly demonstrate the extent to which the contractor's costs were increased by the two factors for which an Article 4 adjustment is here requested, it is necessary to cite the contractor's overall siphon repair costs on the Superior lateral contract. These were as follows:

| | |
|---|---:|
| Labor | $20,000.00 |
| Taxes and insurance thereon | 2,000.00 |
| Engineer expense | 1,000.00 |
| Truck crane (rental from Sept. 25, 1952 through Feb. 7, 1953) | 3,600.00 |
| Two trucks (rental from June 6, 1952 through Feb. 7, 1953) | 800.00 |
| Air compressor and hose and 4 tampers (rental from Sept. 25, 1952 through February 7, 1953) | 900.00 |
| Bulldozer (rental from Sept. 25, 1952 through Feb. 7, 1953) | 3,600.00 |
| Two pumps (rental from June 6, 1952 through Feb. 7, 1953) | 200.00 |
| Misc. small tools and equipment | 600.00 |
| Fuel and oil for crane, trucks and pumps | 1,600.00 |
| Misc. upkeep on above, repairs etc. | 1,200.00 |
| Cement | 500.00 |
| Sand | 30.00 |
| Reinforcing wires, form materials, etc. | 200.00 |
| Superintendence and gen. exp. and profit (10%) | 3,623.00 |
| Total | 39,853.00 |

"As the above figures disclose, the contractor's over-all repair costs on this contract were such that, on the basis of the original contract price, a substantial out-of-pocket loss was the only possible result. Although it is, of course, impossible to fix to the penny the portion of these costs properly attributable to faulty specifications and government use of the laterals prior to their acceptance, the contractor believes that the following analysis in this regard is reasonable and accurate. Though the contractor did not maintain separate records on the cost of removing mud and debris from the siphons, and the detrimental effect of that mud on repair operations, it is believed that a fair allocation of necessary repair costs is 80% to mud and debris complications and 20% to actual repair work on the siphons. Attached hereto as Exhibit 'A' is a siphon-by-siphon breakdown of the contractor's claim, i. e., of the costs and expenses for which an adjustment is requested under Article 4 of the contract.

"As Exhibit 'A' discloses, the additional costs incurred by the contractor by reason of the changed conditions above enumerated is [sic] estimated at $30,868.00. This estimate assumes that $8,985.00 of the total costs incurred by the contractor in siphon repairs was attributable to the contractor's own faulty workmanship, etc. Should the Bureau desire any additional substantiating evidence of these costs, the contractor's job records are open to it at any time. Of this $30,868.00, 80%, or $24,694.40 is properly allocable to the Bureau's use of the contract laterals during the 1952 season, and 20%, or $6,173.60, to the defects in the specifications for the construction of the siphons.

"The contractor respectfully requests the Contracting Officer's early consideration of this claim, and appropriate action thereon."

37. On February 27, 1953 the construction engineer sent the following letter to the plaintiff:

"In accordance with Article 6 of your contract dated March 5, 1951 (Symbol I2r–19373) for earthwork and structures, Superior Lateral System, Bostwick Division, Missouri River Basin Project under Specifications No. DC–3278, this is to inform you that inspection of materials and workmanship for final acceptance of the work was made on February 13, 1953 by the Construction Engineer, and the work is accepted as complete for beneficial use on September 23, 1952. This acceptance is made with the understanding that necessary patrol grading will be done as soon as weather permits. The Government's acceptance of the work does not relieve you of your responsibility under any guarantee, latent defect or clean up provisions of the contract."

38. On March 2, 1953, the construction engineer sent to the plaintiff a final payment voucher together with three copies of a release form. The plaintiff was advised that if the final voucher was satisfactory to sign and return it together with two signed copies of the release.

39. On March 10, 1953 the plaintiff executed a full release without exception of any kind in consideration of the payment of the amount due on final payment of $21,044.07. This amount was paid.

40. The need for siphon repair of at least 40 of the 52 siphons became evident in May of 1952. The plaintiff performed no siphon repair of any consequence until about the middle of October. Of course there was other work being accomplished by the plaintiff but the plaintiff was urged to augment his forces to repair as many of the siphons as possible so that the farmers might be provided with irrigation water for the 1952 growing season. Despite this no repair of

siphons took place until October 17. By arrangement between the plaintiff and the defendant a majority of the laterals were used intermittently between July 13 and September 15, 1952.

41. The repair of the siphons was an extensive operation. Practically all of the work of siphon repair was performed by the plaintiff between October 17, 1952 and January 12, 1953. During this period the plaintiff had an average of 12 workmen on the job. They were not entirely, though largely, engaged in siphon repair. As to the 18-inch siphons, it was necessary to remove such fill as had been placed above the pipe so that the concrete bands at the pipe joints could be examined and repaired where necessary when leaks appeared. On concrete pipe of the diameter of two feet and more, the repair was accomplished from the inside of the pipe. It was necessary to clean out the pipe before the pipe joints could be either examined or repaired. There was much mud in the pipes that had to be cleaned out. The plaintiff insists that the use by the defendant of laterals for the purpose of serving the farmers was the cause of the deposit of the great quantities of mud in pipe. The plaintiff's evidence is not satisfactory to show this. There is in evidence, as plaintiff's exhibit 3, a chart showing the extent of the use of water from those farm turn-outs attached to the various laterals. It does not appear that such use would have deposited the great quantities of mud which the plaintiff had to remove in order to repair the 24-inch and larger pipe. It is found that the mud which had to be removed was deposited in the pipe prior to such beneficial use by the defendant due primarily to the heavy rainfall.

42. Where the concrete pipe in siphons made an abrupt change in direction vertically, the contract drawings called for and the plaintiff installed cradles at the bend in the pipe. This was a concrete bedding under the bend.

43. Measurement for payment for cradle excavation was made to the vertical sides of the trench in which the cradle was poured. Since this same method was used in measuring for payment of excavation for pipe, the only additional payment received by the plaintiff for excavation for the 100 cradles which he installed was for the additional excavation into which the cradle was poured. This amounted to about eight inches under the bend of the pipe extending for its width 12 inches on each side of the bend for the length of the cradle. No wooden forms were used by the plaintiff in pouring the concrete for the cradles. This was made possible because of the nature of the soil which permitted trimming to vertical lines.

44. On March 26, 1952 the plaintiff wrote the following letter of protest to the acting construction engineer:

"In accordance with Article A–12 of the Special Provisions governing the contract, I hereby protest the action of the Bureau of Reclamation in failing to measure and to pay for the structural excavation for concrete cradles on the basis of one foot horizontal and then up on a one-to-one slope as called for in the Specifications.

"Article B–7 of the Standard Specifications, with modifications as outlined on page 14 of the Special Provisions, states that all concrete structures, with the exception of concrete pipe, shall have their excavation measured on the basis of one foot horizontal and then up on a one-to-one slope with the exception that where the material cut into is such that it can be trimmed to the required lines of the concrete structure etc. payment will be made only for the excavation necessary.

"As further justification of my protest I submit the following facts. It is mutually agreed that a blow-off structure, a concrete collar, an encasement, and a thrust block shall have their excavation measured and paid for as described above. The

Specifications do not differentiate between blow-offs, concrete collars, encasements, thrust blocks, and concrete cradles. Therefore, what applies to one must necessarily apply to the other.

"I hereby submit my claim as outlined below:

| | |
|---|---|
| 80 cradles at 50 yds. struc. ex. at $.80, .... | $3,200 |
| backfill at .20 ........................ | 800 |
| Int. at 6% on average delay of 6 mos. .... | 120 |
| | $4,000 |
| Total ........................ | $4,120 |

———◇———

"This work is 75% complete at this time."

45. On August 8, 1952 Mr. Boyce wrote to the plaintiff as follows:

"On August 4, 1952, Mr. Robert Hackett representing the United States Guarantee Company called at the office of the Chief Engineer to discuss your claim with respect to measurement for payment of excavation and backfill for concrete cradles as submitted in your letter of March 26, 1952.

"Paragraph B–7 of the 'Standard Specifications for Construction of Canal Systems March 1949,' provides in part as follows:

" '* * * excavation for structures will generally be measured for payment to lateral dimensions 1 foot outside of the foundations of the structures and to slopes of 1 to 1 for common or unclassified excavation and ¼ to 1 for rock excavation: *Provided,* That where the character of the material cut into is such that it can be trimmed to the required the concrete placed against the sides lines of the concrete structure and of the excavation without the use of intervening forms, payment will be made only for the excavation within the neat lines of the structures * * *.'

"The excavation for the cradles was not staked out and no instructions were given regarding the lines and dimensions to which you should excavate. The excavation for pipe trenches at cradle locations was made to vertical sides and no additional excavation was made except for the space occupied by the cradle concrete. At your election the cradles were not formed on the sides and the concrete was placed directly against the excavation.

"Mr. Hackett pointed out that because the width of the cradles as shown on the drawings is slightly less than the width of the trenches as established for payment purposes, it was not possible to place the concrete to the neat lines without the use of intervening forms. Mr. Hackett further stated that for this reason the proviso of the specification provision quoted above was not applicable.

"However, Paragraph B–7 of the standard specifications contains a further proviso which reads as follows:

" '*Provided further,* That for any structure where conditions warrant, the excavation will be measured for payment to the most practicable dimensions and lines as staked out or otherwise established by the contracting officer.'

"Inasmuch as you were able to place the concrete directly against the sides of the excavation without the use of intervening forms and without excavating to 1 foot outside the foundations of the structure and

to slopes of 1 to 1, it is determined that the lines and dimensions to which you actually excavated for the cradles were the most practicable lines and dimensions for the excavation. Therefore, in accordance with the provisions of Paragraph B-7 of the standard specifications as quoted above in this paragraph the lines and dimensions to which you excavated for the cradles are established as the lines and dimensions to which measurement for payment of excavation and backfill will be made.

"In the case of Clifford A. Dunn v. the United States (100 Ct.Cl. 440) where specifications language similar to that in your contract was involved, the Court of Claims held that the Government did not anticipate paying for unnecessary excavation and ruled that the contractor was not entitled to payment for excavation outside the lines to which the excavation was actually made."

46. On September 23, 1952 the plaintiff wrote to Mr. Boyce's superior, Mr. Grant Bloodgood, Chief of Construction, Bureau of Reclamation, Denver, Colorado, in which the plaintiff further discussed his claim for additional excavation for cradles. He suggested that he would prefer to maintain the correspondence on the subject outside of the prescribed procedure generally applicable to formal claims since it related to contract interpretation.

47. On October 21, 1952 the contracting officer sent the following letter to the plaintiff:

"By letter dated August 8, 1952, the Construction Engineer advised you that payment for excavation and backfill for concrete cradles would be made only to the lines and dimensions to which you actually excavated for the cradles. In your reply of August 14, 1952, you stated that no exception had been taken to certain contentions of Mr. Hackett, Engineer for the United States Guarantee Company, and you also requested advice as to why the most 'practicable dimensions' theory applies in the case of cradles only.

"You were advised by the Construction Engineer in a letter dated August 20, 1952, that your claim would be considered in findings of fact. This would be the usual procedure in matters of this nature. However, because of your expressed desire to maintain the current correspondence outside of the prescribed procedure applicable to formal claims, I will endeavor to clarify some of the questions raised in your letter of August 14, 1952.

"As I understand your claim, it is your position that, because the trenches were wider than the dimensions of the concrete cradles shown on the drawings, the cradles could not be constructed to the widths shown without the use of some intervening forms, and therefore the proviso of Paragraph B-7 of the Standard Specifications relative to placing concrete directly against the sides of the excavation is not applicable. It is your further contention that the provision of Paragraph B-7, which states that excavation will generally be measured to lateral dimensions 1 foot outside of the foundations and on slopes of 1 to 1, is applicable even though the material for which you are asking payment as excavation was not actually excavated or required to be excavated.

"It is readily admitted, as contended by Mr. Hackett, that in order to construct the concrete cradles to the dimensions shown on the drawings some intervening formwork would have been required on the sides of the cradles. However, you elected to fill the space between the specified edge of the cradle and the side of the trench with concrete rather than to furnish the forms necessary to construct the cradles to the specified width. The space filled with excess concrete varies with the

size of the pipe, but in all cases is only a few inches. This excess concrete is of no benefit to the Government and its only purpose was to permit you to eliminate the form-work.

"The following provision of Paragraph B–7 of the Standard Specifications is pertinent to the matter under consideration:

" ' * * * *  *Provided further,* That for any structure where conditions warrant, the excavation will be measured for payment to the most practicable dimensions and lines staked out or otherwise established by the contracting officer.'

"Inasmuch as you were able to confine the excavation for the cradles to lines within the trench widths as excavated and did not find it necessary to excavate to dimensions of 1 foot outside the foundations and on slopes of 1 to 1, there appears to be no question that the lines to which you did actually excavate were the most practicable dimensions and lines. The work was never staked out in the field. In case of Dunn v. the United States, 100 Ct.Cl. 440, the specifications language was the same as that under consideration here. In this case the work was not staked out in the field and the court held that by using the actual excavation lines as the basis for measurement for monthly estimates (as was done in your case), the contracting officer did 'otherwise establish' a basis of measurement for payment within the meaning of the specifications and that the specifications did not require that the different basis of measurement for payment should be established before any of the work was done. The court further held that the slopes stated in the specifications were principally intended to be maximum slopes beyond which, if the plaintiff exceeded them, he could not collect pay for the excess unless the contracting officer authorized the excess.

"In my opinion the provision of the specifications that excavation will generally be measured for payment to dimensions of 1 foot out from the foundations and on slopes of 1 to 1 is not applicable to cradles, because different lines for such excavation have been 'otherwise established' by the contracting officer as the most practicable dimensions and lines. It follows then that payment for the excavation and backfill for cradles has been made in accordance with the specifications and there is no proper basis for any additional payment. This determination is fully substantiated by the decision of the Courts of Claims referred to above which is exactly in point.

"In your letter of August 14, 1952, the question is raised as to why payment for excavation for other types of structures was not limited to the actual excavation performed. First, I should like to point out that the paylines for cradle excavation were not established by a retroactive determination, as inferred by you. The partial payments made as the work progressed were all made on the basis of the amount of actual excavation performed. In the case of other structures where payment was made to 1 to 1 slopes, the contracting officer did not 'otherwise establish' other paylines within these slopes, and therefore payment was in accordance with the paylines established in the contract.

"If you still wish to pursue your claim on excavation for the cradles, an exception may be made on the release on contract and the matter will be considered in findings of fact."

48. On December 11, 1952, the contracting officer affirmed his decision as to measurement for payment of excavation for cradles and advised the plaintiff that if he desired to further pursue his claim, an exception might be made on the release on the contract and the matter would be considered in findings of fact. As noted previously, no exception was

taken by the plaintiff when he executed the release on final payment.

49. If the defendant had agreed with plaintiff's claim for additional payment for cradle excavation, the plaintiff would be entitled to be paid for an additional 5,109 cubic yards of excavation at 80 cents per yard. The contract price for backfill was 20 cents per yard.

50. The defendant caused the plaintiff no damage whatever on account of the period of inclement weather in 1951. The plaintiff's claim appears to be equated with $100 per day liquidated damages for delay provided in the contract. As noted earlier, the plaintiff was given such extensions of time for completion as required to excuse the payment of any liquidated damages and none were paid.

51. During the performance of the contract, the plaintiff made no attempt to maintain any record of the cost of siphon repair. At the end of the work the plaintiff made his itemization of his siphon repair costs from recollection. This was submitted as plaintiff's claim for siphon repair costs as quoted in finding 36. It is clear from the evidence that due to poor workmanship the plaintiff was put to considerable expense in repairing at least 40 siphons. The evidence is not satisfactory as to amount.