M. F. COMER BRIDGE AND FOUNDATION CO.

v.

UNITED STATES.
No. Cong. 1–57.

United States Court of Claims.
Dec. 2, 1959.

Claude Pepper and Charles Bragmen, Washington, D. C., for plaintiff.

William A. Stern, II, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

LARAMORE, Judge.

Plaintiff seeks to recover for losses and damages sustained as a result of delays on a contract for the reconstruction of a pier at the Key West Naval Base, Florida, or in the alternative, to have the court report to Congress that plaintiff has an equitable right to recovery.

The case comes before the court as a result of a Senate Resolution which reads, as follows:

"*Resolved*, That the bill (S. 156), entitled 'A bill for the relief of M. F. Comer Bridge and Foundation Com-

pany' now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant."

The Senate Bill referred to in the Resolution reads as follows:

"That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, the sum of $113,480.69, to the M. F. Comer Bridge and Foundation Company, of Miami, Florida, in full satisfaction of its claim against the United States under contract numbered NOy27245, dated June 25, 1951, entered into by such company with the United States Government through the Chief of the Bureau of Yards and Docks of the Navy Department, and providing for the reconstruction by such company of pier D–3, operation development station, naval base, Key West, Florida, for loss and damages sustained by such company, as a result of delays on the part of the Government in establishing a proper defense order rating for use under such contract and in issuing a contract change order."

The questions presented are: (1) Were the delays the result of a breach of a contractual duty of defendant, (2) should the release signed by plaintiff's treasurer be set aside, and (3) is there an equitable basis for recovery.

The facts are fully found by a Commissioner of the court and attached hereto. A brief summary of said facts reveal the following:

Plaintiff was awarded a contract for the reconstruction of a dock facility in Key West, Florida, the details of construction being more fully set forth in finding 3. Plaintiff was delayed in obtaining materials and as a result thereof incurred extra costs in the amount of $65,000. After time extensions had been granted because of additional work and delays in procurement of steel, which were not the fault of plaintiff, said work was completed on January 30, 1953. Because the work was usably completed on November 16, 1952, defendant did not charge the plaintiff liquidated damages. On February 13, 1953, defendant sent plaintiff a release to be signed by it and its assignee, the Mercantile National Bank of Miami, Florida. On February 16, 1953, T. D. Gray, plaintiff's treasurer, at the direction of Edward P. Comer, plaintiff's president, signed the release, as did plaintiff's assignee. Comer did not read the release before directing Gray to sign it on behalf of the company, nor was there a discussion as to what effect the signing would have upon any possible claims against the defendant. Comer alone had the authority to sign the release on behalf of plaintiff, or to authorize Gray to sign it. Although Comer was at the time under a physical and mental strain because of his wife's illness and pressure of business which, as testified by his doctor, would impair the making of proper judgment on business matters, he (Comer) was under no pressure exercised by defendant and was able to understand the nature of his act.

On April 21, 1953, plaintiff wrote to defendant requesting a renegotiation because of losses under the contract. The request for compensation for its losses was denied. An appeal followed which was dismissed for lack of jurisdiction. Thereafter this suit was filed pursuant to Senate Resolution 97 of February 18, 1957.

■ In respect to the legal claim, plaintiff lists three duties which it claims defendant had and which defendant

failed to perform. The first alleged duty is that defendant had the duty to promptly, upon the award of a contract, issue an appropriate defense order rating to insure prompt delivery of steel materials by the third quarter of 1951.

However, in respect to the alleged first duty, the evidence and findings show that the delays encountered by plaintiff in procuring its steel requirements were caused by its supplier, Tennessee Coal, Iron and Railroad Company (hereinafter referred to as TCI), and the defendant was not responsibile for any delays. Furthermore, the evidence fails to disclose that there was any custom that defense order ratings should accompany the award of the contract, or that the processing of the defense order rating was slower than normal for the time in question. The evidence further fails to disclose that TCI would have delivered plaintiff's steel requirements any sooner than it eventually did, even if plaintiff had received its defense order rating when the contract was signed.

■ The second alleged duty was that defendant was to provide assistance in the prompt securing of steel materials required, either by directive or other means, when requested by plaintiff in July, November, and December of 1951.

In this respect the evidence and the findings show that the defendant refused to issue a directive because the subject contract was not sufficiently vital to the defense effort, and under the policy of the office, directives were only issued when the work to be performed was vital to the defense effort. Obviously, some discretion had to be vested in the officer in charge of the work in order to carry on any semblance of a defense effort. The officer in charge, under those circumstances, could not have acted arbitrarily or abused the discretion in denying plaintiff's request for a directive.

■ The third duty which plaintiff asserts defendant breached was in not promptly approving the shop drawings for steel accessories when they were submitted by plaintiff to defendant in October 1952.

Here again we can find no evidence that the defendant delayed approval of shop drawings. TCI never attempted to charge its delays to failure of the defendant to approve shop drawings. TCI's reason for delay is best explained by its letter to plaintiff of March 13, 1952, in which it stated:

"We want to assure you that we recognize the importance of this project and your order and we have been constantly following it for completion. Frankly, it seems that we have been jinxed by numerous rejections of the rounds at our producing mill and as a matter of fact the last material was only rolled over last week end, consisting of approximately 8 pieces of $2\frac{3}{4}''$ and $2\frac{5}{8}''$ rounds."

Therefore, it is clear from the evidence, as disclosed fully in the findings of fact, that no legal liability rests upon defendant to reimburse plaintiff for any losses sustained.

Plaintiff's alternative ground for recovery is that the defendant is equitably liable and in this respect states three reasons for claiming equitable entitlement to compensation.

■ The first reason alleged is that S. 156 provided that the Court ignore the release. We cannot read into S. 156 any such provision, and even though it had contained such a provision, it would have no force and effect in a court. It could only amount to an opinion of the Bill's sponsor. The Bill in its final drafted form did not contain the language present in the companion bill, H.R. 2607, which stated:

" * * * which delays were due to causes beyond the control and without the fault or negligence of said company, in consideration of equity and good conscience, and notwithstanding the fact that said company signed a contract release to the Government and accepted payment

on the contract without any reservations by said company in the release."

Either the Senator who introduced the Bill thought that equity did not require payment or that the matter should be determined by a court, inasmuch as the language of the House Bill was stricken from the Senate Bill before introduction. In any event, it is for the court to determine whether or not plaintiff has an equitable claim and such determination must flow from the facts and not the wording of the pending legislation.

■ Plaintiff's second reason for equitable recovery is that even if S. 156 did not so provide, in equity, the release should be set aside. Plaintiff bases this argument solely on the alleged fact that its president, Mr. Comer, was under the care of a doctor by reason of age, illness of his wife, business worries, and a fire which destroyed his home.

Here again we refer to the evidence and the findings of fact. While the facts do disclose an impairment of plaintiff's judgment as a result of the above outlined circumstances, his own doctor testified that at the time the release was signed he (the doctor) would have been willing to sign as a witness to the execution of a will by a person in Mr. Comer's state. Generally the test in that circumstance is whether the person making the will was of sound mind and disposing memory and aware of what he was doing. Applying the same test to the action of Comer, since his doctor in effect thought he was of sound mind, we are forced to agree. This is especially so because of the circumstances surrounding the signing of the release. Comer told Gray to sign. Gray was certainly aware of all the facts and consequences. Comer merely told Gray to sign it for the reason that the subcontractors and bills had to be paid—that always on the tenth of the month no bill was unpaid. This was testified to by Comer himself and rather than proof of incapacity, it seems to us to be the action of an honest and informed business man. Perhaps his judgment was somewhat impaired, but the fact still is present that plaintiff received from the defendant over $100,000 as a result of the release and plaintiff still retains the money. This it seems to the court was a sufficient consideration for the signing of the release and the factor which motivated the action. Furthermore, Gray, as treasurer, owed some duty not only to himself as an officer in the company, but a duty to the company as well, not to do an act which would be a detriment to the best interests of all concerned. When he signed, he (Gray) knew the consequences of his act and if Comer was mentally incapacitated he should not have signed. In this respect the facts show that Gray, being a brother-in-law of Comer, knew all the circumstances surrounding Comer's condition. Moreover, defendant exercised no pressure upon plaintiff or its officers to obtain the release. Even if the release were voidable, the plaintiff's loss was attributable to the delay of TCI and not to the defendant's conduct. Thus the vitiation of the release would not benefit the plaintiff. Therefore, under all the facts and circumstances of the case, we can see no reason why plaintiff should be relieved from the effect of the signed release.

■ Finally, plaintiff argues that its claim is equitable because in an "identical" situation Congress established such a legislative policy by passing a bill to compensate another contractor, Gable Construction Company.

None of the Committee reports in the Gable case were introduced in evidence and consequently were not properly before the court. Wigmore on Evidence, section 2577. For this reason the court cannot take cognizance of the reports, which were offered for the first time in connection with plaintiff's oral argument.

However, Congress can take notice of its own proceedings and if it desires to make an award based on the broad principles of equity, Gay Street Corporation v. United States, 127 F.Supp. 585, 130 Ct.Cl. 341, it has the benefit of the facts in this case which show the losses sus-

tained by the plaintiff, together with its own proceedings regarding Gable Construction Company.

We conclude that plaintiff has neither a legal nor an equitable claim against the United States. Plaintiff's petition will be dismissed.

This opinion, together with the findings of fact which follow, will be certified to Congress pursuant to S.Res. 97, 85th Congress, 1st Session.

JONES, Chief Judge, and LITTLETON (Retired), and WHITAKER, Judges, concur.

### Findings of Fact.

The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:

1. On January 7, 1957, there was introduced in the Senate of the United States a Bill, S–156, for the relief of M. F. Comer Bridge & Foundation Company, which provides as follows:

"That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, the sum of $113,480.69, to the M. F. Comer Bridge and Foundation Company, of Miami, Florida, in full satisfaction of its claim against the United States under contract numbered NOy27245, dated June 25, 1951, entered into by such company with the United States Government through the Chief of the Bureau of Yards and Docks of the Navy Department, and providing for the reconstruction by such company of pier D–3, operation development station, naval base, Key West, Florida, for loss and damages sustained by such company as a result of delays on the part of the Government in establishing a proper defense order rating for use under such contract and in issuing a contract change order."

The Bill was referred to the Committee of the Judiciary, which, as a result of a report thereon, dated February 18, 1957, submitted a Resolution to the Senate, which passed the following Resolution:

"*Resolved*, That the bill (S. 156) entitled 'A bill for the relief of M. F. Comer Bridge and Foundation Company' now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.

A companion bill (H.R. 2067) was introduced in the House of Representatives on January 5, 1957. The House bill virtually duplicated the language of the Senate bill, with the exception that the former contained the following additional clause at the end:

" * * * which delays were due to causes beyond the control and without the fault or negligence of said company, in consideration of equity and good conscience, and notwithstanding the fact that said company signed a contract release to the Government and accepted payment on the contract without any reservations by said company in the release."

No action was had on the House bill.

2. Plaintiff is a corporation organized under the laws of the State of Florida in 1928. Since that time it has engaged in the construction of bridges, docks and other marine work, and, to a limited extent, in the rental of equipment owned by

it when not in use. It ceased active business in 1956, but retained its legal identity as a corporation.

3. Plaintiff, at its own request, received from the Department of the Navy on May 18, 1951, all necessary documents enabling it to bid on a contract for the reconstruction of Pier D–3 at Key West, Florida. The work was to consist of removing the existing fender system, concrete slabs and foundations, portions of timber trestles, a concrete block building and a wood frame building, utilities lines, and portions of existing steel sheet piling; the construction of approximately 2,000 linear feet of steel sheet pile bulkhead; with ties, anchors and curb, a concrete pipe trench, dredging and filling behind bulkheads, grading, bituminous paving of pier area, and the extension of utilities to the pier area.. The officials and engineers of plaintiff company who prepared its bid and estimate were competent and experienced. They made adequate inspection of the site and due consideration was given to the anticipated cost factors. Plaintiff thereupon submitted its bid in the amount of $618,252, which included a 10 percent profit. Plaintiff's bid was about $47,000 lower than the next highest bid, and about $57,000 lower than the next two succeeding bids submitted by other bidders. The Navy estimate for performing the work was $692,000. It was the policy of the Navy to advise a bidder, where his bid was more than 10 percent lower than a second bidder, to reconsider his bid before acceptance by the Navy. Since plaintiff's bid was less than 10 percent below the second bidder, although it was more than 10 percent below the Navy estimate, it was not referred back for reconsideration. Plaintiff is not claiming it made any mistake in its bid. Plaintiff was unable to locate its original estimate.

4. The plaintiff received notice of award from the District Officer in Charge of Construction, Charleston, South Carolina. On June 25, 1951, a contract in the usual form was entered into between the parties. Paragraph 1–01(a) of the specifications, which were part of the contract, provided:

"(a) *Priority.*—A 'Defense Order Rating' will be established on this project, if applicable, and assigned to the contractor for use in obtaining materials and services required for incorporation in the work after award is made, and shall be used in accordance with the rules of the National Production Authority. Defense order ratings will be issued by the Bureau of Yards and Docks direct to the contractor."

In preparing its estimate plaintiff relied on the foregoing provision of the specifications as an assured means of securing prompt delivery of scarce materials, particularly sheet piling and accessories. Plaintiff contemplated securing said material by September 1951 from the Tennessee Coal, Iron and Railroad Company (hereinafter referred to as TCI), a division of the United States Steel Corporation, of which plaintiff had been a customer for many years. Prompt delivery of these materials was an important consideration in the coordinated operation upon which plaintiff's bid was predicated.

5. Prior to the contract in suit, and for some years before, contractors with the Government were required to obtain defense order ratings, commonly known as DO ratings, in order to obtain controlled materials for use under their contracts. The Navy issued such defense order ratings through the District Public Works Office, Officer in Charge of Construction, Sixth Naval District, United States Naval Base, Charleston, South Carolina. In addition to defense order ratings there was put into effect a controlled materials plan (CMP) for steel, copper and aluminum, pursuant to a plan used in World War II, which was revised and became effective July 1, 1951, for deliveries beginning in that calendar quarter. Under it the Bureau of Yards and Docks, or contractors concerned, filed applications for allotments of materials and received certificates which enabled the contractor to order controlled materials in accordance with regulations. Under

the plan a contractor was not given a priority in ordering materials, but he was required to have a defense order rating to be permitted to purchase such materials. The authorization allowed suppliers to furnish defense materials upon a first-come-first-served basis to holders of DO ratings. In addition to the CMP and DO rating programs for control of production and priority in distribution of scarce materials, two other methods were provided for use in emergency situations, the DX rating and the individual directive. These are described in the following excerpt from page 50 of Progress Report No. 11 of the Joint Committee on Defense Production (Senate Report No. 1061, 82d Congress, 2d Session), dated January 15, 1952:

*"The DX rating*

"The DX rating became effective by amendment to NPA Regulation 2 on September 13, 1951. This rating is authorized for use only as an emergency rating to obtain products and materials in urgent cases and is used primarily to break individual bottlenecks delaying the programs of the Department of Defense and the Atomic Energy Commission. The DX rating has been used sparingly, as is evidenced by the fact that since its introduction on September 13, through October 31 only 339 DX ratings had been issued. It is the intent of NPA to hold the use of DX ratings to a minimum and to make sure that it does not become in any sense a superrating band but is kept to its original purpose of breaking individual bottlenecks in special cases. The DX rating is issued through the Priorities and Directives Division of NPA. In extreme emergencies the Department of Defense and Atomic Energy Commission may, by delegation, issue a DX rating. To date, neither agency has exercised this authority.

*"The individual directive*

"The individual directive constitutes the highest form of priority action which can be taken by NPA since by its terms the individual directive can override any other order or regulation of NPA. It is used only in cases of extreme urgency and in most instances takes the form of directing a specific supplier to deliver to a specific customer specified amounts of materials or products by a specified date. A directive is not issued until a thorough investigation is made to determine the effect of the directive on a supplier's production schedule and the interference or delay in filling other important defense orders."

6. On June 23 the District Public Works Officer at Charleston requested the Bureau of Yards and Docks in Washington to issue a priority rating for plaintiff's use in the procurement of material and equipment. On June 25 the plaintiff noted to defendant that, despite the specification provision, the defendant had not accompanied the contract with a DO rating. On June 28 the District Public Works Officer advised plaintiff that it had requested the Bureau of Yards and Docks "to issue a Defense Order on this contract in order that all materials may be procured without delay", and that the DO would be forwarded to plaintiff from the Bureau. On July 3 the District Public Works Officer informed plaintiff that the DO which it had requested be issued would cover all materials and equipment to be used in the contract "other than those included in the Controlled Materials Plan, i. e., steel, aluminum and copper." On July 5 the Navy issued to plaintiff a DO rating, received by plaintiff on July 7, which allotted to plaintiff all the controlled materials it would require, except carbon steel structural shapes, for delivery in the third and fourth quarters of 1951. As to the carbon steel structural shapes which the plaintiff would need, the DO received by plaintiff on July 7 instructed as follows:

"The attached authorization does not give an allotment for carbon steel structural shapes. If you re-

quire carbon steel structural shapes for delivery during the third or fourth quarters of 1951, submit your estimated requirements for each quarter, identified by contract number, direct to address shown in item 6 of attached form [i.e., Bureau of Yards and Docks in Washington]."

7. On July 9 and 10, 1951, pursuant to the defendant's instructions quoted in the preceding finding, the plaintiff advised the Bureau of Yards and Docks that it had ordered from a supplier (i. e., TCI) carbon steel structural shapes aggregating 1,418 tons for delivery in the third quarter 1951, and that it wished permission to order an additional 136 tons of the same classification materials. The shapes included steel sheet piling, steel-bearing piles, welded and riveted fabricated pieces, tie-rod assemblies, and wales.

8. Prior to the contract award the plaintiff had been negotiating with TCI for the supply of all of its steel requirements. TCI informed plaintiff by letter dated June 25, 1951, that it could not reserve any tonnage for plaintiff until it received a DO rating, that a 45-day lead time was needed to deliver any new orders, and that orders for September delivery would have to be in by July 15. TCI also advised plaintiff in the same letter to begin negotiations with the Navy to procure a CMP rating for the project, since DO ratings were on the way out. The plaintiff had at that time been assured by the Navy that an "appropriate D.O. rating" would be assigned the project, and the plaintiff had requested the Navy's cooperation in converting to CMP ratings when the DO rating system would become superseded. On July 7, the same date it received the DO rating described in finding 6, the plaintiff forwarded it to TCI with a renewed request for September delivery, and pointing out that it was in the process of applying for an allotment and rating to cover the portion of its order to TCI for carbon steel structural shapes which the

issued DO rating did not cover. On July 13 TCI acknowledged receipt of the DO rating for non-carbon steel items, and also acknowledged the plaintiff's order for the carbon steel items. As to the latter TCI advised in the same letter that the DO rating already issued might cover most of the piles and accessories for which plaintiff was then awaiting the issuance of a CMP allotment, since TCI thought that they were not actually classifiable as carbon steel structural shapes.[1] TCI placed the entire order with its Munhall, Pennsylvania, mill with the request for September 1951 delivery, and promised to inform plaintiff whether the order could be accepted for delivery that month or the two succeeding months. On July 18 TCI informed plaintiff that the order for piling had been accepted for delivery in October and November, instead of September, because of lack of open production space at the mill. Since September was in the third quarter while October and November were in the fourth quarter, TCI advised plaintiff in its July 18 letter that it would have to have by July 25 an appropriate CMP fourth-quarter allotment for all of the piling and accessories. Otherwise TCI would have to remove plaintiff's order from its Munhall mill production schedules and plaintiff would lose its first-come-first-served priority standing. On July 20 plaintiff received and transmitted to TCI an authorization from the Navy for third-quarter delivery of 1,554 tons of carbon steel structural shapes as previously requested by plaintiff from the Navy on July 9 and 10 (see finding 7). Apparently this was of no use to plaintiff when issued, because by then TCI's production schedule would not permit delivery of carbon steel structural shapes prior to the fourth quarter, and a third-quarter order was no good for fourth-quarter deliveries. Plaintiff informed TCI that delay in delivery was going to cause hardship.

9. On July 20 the plaintiff wrote to the Bureau of Yards and Docks request-

---

[1]. This situation is unclear in the record. Apparently TCI later felt that the DO previously received was not adequate for accessories.

ing aid in expediting deliveries and complaining that "this delay is costing us four to five months of our contract time, and may cause us serious hardship". On July 26 the Bureau advised the Officer in Charge of Construction that the plaintiff had furnished no justification to improve delivery other than delay in contract completion date, and that "Unless a sufficient urgency can be shown in the light of the defense effort to initiate directive assistance, further action will be taken by the Bureau." The Officer in Charge of Construction was also informed that all requests for expediting assistance should originate with him, and that he should consult BuDocks Circular Letter 51–49 prior to initiating expediting action to improve delivery of the steel piling. Th Circular Letter referred to is not in evidence.

10. On July 31, 1951, TCI wrote plaintiff that, mill conditions permitting, it expected to ship to plaintiff the bearing pile in October and sheet piling in November, as ordered, and regretted its inability to accept the purchase order as requested, due to prior receipt of other CMP rated orders.[2]

11. On August 28, 1951, the Navy issued to plaintiff a CMP allotment for 1,327 tons of carbon steel structural shapes for fourth-quarter delivery. The allotment form had a rider which authorized plaintiff to obtain third-quarter delivery of carbon steel structural shapes, which seems redundant in view of the fact that plaintiff had previously on July 20 (finding 8) been issued a CMP allotment for third-quarter delivery of 1,554 tons of such shapes.

12. On September 17, 1951, the plaintiff advised TCI that it had based its construction schedule on anticipated delivery of steel in November 1951, and requested immediate advice if there was to be any deviation from that schedule. To this letter TCI replied on September 21 that the steel-bearing piles would be produced in October and would be held for shipment to be included in a carload with other materials in November, and that:

"The Steel Sheet Piling in this order is scheduled for November production, together with the accessories. It is a little early to determine just on what date the Steel Sheet Piling is scheduled in as much as our mills are now in the process of preparing expected rolling schedules for November. We hope to have available during early October the detailed drawings of this project which we will mail to you for approval. Of course, no accessories on this order could be produced until these approved drawings are returned to our general offices."

13. On September 24, 1951, the National Production Authority of the United States Department of Commerce (hereafter NPA) issued to plaintiff an "Authorized Construction and Allotment of Controlled Materials" on Form CMP 13, which gave to plaintiff an allotment for 64.15 tons of carbon steel items (reinforcing steel) and 1,837 tons of copper and copper-base alloy brass mill products for delivery in the first quarter of 1952. This order authorized the plaintiff, "when necessary because of delays in construction schedules, to reschedule deliveries to a succeeding quarter even though the allotment was valid for and used in an earlier quarter. Under this condition only, the prime contractor may reschedule Authorized Controlled Materials Orders already placed with a producer and may reschedule any unused portion of his allotment for a given quarter to a succeeding quarter, either in placing Authorized Controlled Materials Orders for his own use or in making allotments to sub-contractors and secondary consumers."

2. It is not clear from this letter whether TCI meant that, while it could probably deliver the piling in October and Novem-
ber, it could not accept the order as to accessories.

14. On October 15, 1951, the plaintiff wrote to TCI as follows:

"We have written repeatedly emphasizing the importance and necessity of having accessories shipped in conjunction with our order of June 25th., 1951, your mill No. PJ 217–Gp.

"We will be unable to place a single piece of steel until you supply us with detail 'H' sheet 5 of 9, Noy–27245. The above, together with detail 'X' sheet 5 of 9, Noy–27245, 2 fabricated corners must be shipped with first shipment of steel sheet piling.

"Further reference is made to our letter of September 17th. 1951 advising you of our construction schedule and the order in which we must have delivery on the accessories. Your urgent attention to these details is requested.

"In telephone conversations mention has been made of shop drawings covering accessories. These drawings were promised for early October. To date these drawings have not been received. Please expedite this matter."

15. On October 22, 1951, TCI sent certain shop drawings to plaintiff asking that they be reviewed and returned approved or with corrections noted. TCI expressed regret in delaying the drawings, and promised to try to accomplish shipment of accessories as promptly as possible. Plaintiff replied to TCI's letter on October 26 to the effect that the drawings could not be given approval until the officer in Key West returned from leave, and again emphasized the importance of delivery of accessories in specified order at the earliest possible moment.

16. On November 1, 1951, the plaintiff sent to TCI approved shop drawings with minor corrections by the Officer in Charge of Construction, and urging that the necessary accessories be delivered with the steel sheet piling.

17. On November 9, 1951, the Officer in Charge of Construction reminded plaintiff that it was the latter's responsibility to get orders accepted by suppliers as soon as allotments were made, and suggested that, since TCI could not make first-quarter-1952-delivery of reinforcing steel which had been allotted to plaintiff on September 24 (finding 13), the plaintiff should shop around with other suppliers, failing which the assistance of the Inspector of Naval Materials would be requested.

18. On November 15, 1951, TCI telegraphed plaintiff it still had about 36 tons of piling to be shipped, and would send with them certain accessories consisting of three fabricated corners, but that "On the remainder of accessories regret to advise will be about 60–90 days delay."

19. On November 19, 1951, plaintiff wrote to the Officer in Charge of Construction, setting forth the history of its order for steel with TCI, and referring to TCI's telegram of November 15 advising plaintiff of a 60–90-day delay in production of the accessories. The letter stated in part:

" * * * This seems unreasonable and capricious, because from the acceptance of the order, the schedule for production of the steel sheet piling and accessories has been treated as simultaneous projects.

"If this delay is permitted, it will result in almost immediate cessation of work on Contract NOy–27245. Our crew will lose living quarters in Key West, a vital matter at this time of year as resort conditions prevail. We cannot afford to maintain our present efficient organization unless this work is allowed to continue.

"Relief is requested, and a directive for immediate delivery of this material is suggested."

20. Responding on November 23 to plaintiff's November 19 request for the issuance of a directive, the Officer in Charge of Construction advised plaintiff

that the request was being forwarded to the Inspector of Materials for "progressing", and that:

"In many cases the Inspector of Naval Materials can locate the required materials as they have first hand information on the location of certain materials. However, it is the contractor's responsibility to place an order with the supplier located by the Inspector of Naval Materials or a supplier found by the contractor, if assessment of penalties as provided under the contract is to be avoided."

There is no evidence in the record that the Inspector of Naval Materials made any effort to locate the materials. At the same time the Officer in Charge of Construction wrote to TCI requesting it to expedite the delivery of fabricated materials to the plaintiff. TCI responded on November 27 that it was making a special effort to improve its delivery promise, but could not guarantee any delivery date because of "difficulties and uncertainties under which we are endeavoring to operate today". On December 4, TCI urged plaintiff to seek a directive from defendant to expedite tie rods.

21. By letter dated December 5, 1951, the Officer in Charge of Construction advised the plaintiff in part as follows:

"Full consideration has been given to your request for a directive and a determination has been made to the effect that the project which is being accomplished under the subject contract, is not sufficiently vital to the Defense Effort to warrant the issuance of such a directive. Accordingly, no such directive will be issued.

\* \* \* \* \* \*

"It is realized that your company acted promptly when the contract was awarded to you in preparing the necessary forms for allotment of controlled materials and that immediate action was taken to order the necessary steel from a supplier. Records in this office also indicate that the material supplier originally scheduled delivery of all the necessary materials for the Third Quarter 1951. It is also realized that the material delaying the accomplishment of the work under this contract; namely, 82 tons of tie rod assemblies, complete with turnbuckles and nuts, is only a small portion of the total of approximately 1,327 tons of steel piling and accessories. This office also has knowledge of the fact that your company has key personnel stationed at the site of the work (Key West, Fla.) in readiness to accomplish the work upon receipt of the necessary materials." [3]

Plaintiff made reasonable attempts to secure certain of the accessories from other suppliers without success.

22. Under date of December 11, 1951, the Officer in Charge of Construction advised the Inspector of Naval Material as follows:

"1. By reference (a) this office was advised that all material except 82 tons of tie rod assemblies is scheduled for fourth quarter 1951 delivery, and that a directive is necessary for a fourth quarter 1951 delivery of the tie rod assemblies.

"2. It is the policy of this office to request a directive only when a project is sufficiently vital to the defense effort to warrant the issuance of such a directive. By enclosure (1) the Contractor was notified accordingly and was instructed to submit a request for a first quarter 1952 allotment to cover the 82 tons of tie rod assemblies."

23. On December 13, 1951, the NPA issued to plaintiff an allotment covering 82 tons of carbon steel items (probably

---

3. The pier was used and to be used in connection with training functions for war vessels during the Korean fracas.

tie rods) for delivery in the first quarter of 1952, and the plaintiff extended the same to TCI without delay. At that time TCI could not give a definite shipping date for the tie rods, and expected to deliver certain other fabricated items in early January 1952. By the end of December TCI postponed the probable shipping date to late January. By January 22 TCI revised the shipping date of tie rods to February, and was uncertain about certain accessories.

24. On February 1, 1952, the plaintiff wrote to TCI as follows:

"With further reference to your EJ–25, we still hold you strictly accountable for the glaring error in your 'Project Quotation' dated May 24th., 1951. This error has cost us too many thousand dollars to be settled with platitudes.

"From the inception of the above captioned order we have outlined our plan of operation to you, indicating the order in which we required delivery of material. In spite of acknowledgments and promises you have ignored our requests and broken your promises. We now find ourselves with thirteen hundred tons of steel sheet piling, and eighty tons of fabricated wales on hand, and are unable to use them because you have failed to ship corners, tie rods and plates in the order requested. In a telegram dated January 22nd., 1952 you promised to advise us on the status of the balance of this order. To date we have heard nothing. May we have the courtesy of a reply.

"Because of your dilatory handling of this order we are being forced to suspend work on the subject contract until you ship materials, as experience has taught us that your promises mean nothing."

25. On February 1, 1952, the plaintiff informed the Officer in Charge of Construction as follows:

"* * * We have performed all preliminary work and due to delay in delivery of steel sheet pile accessories we find ourselves without constructive work at the job site. We, therefore, propose to leave the project in charge of a skeleton crew until such time as necessary material for continuous operations are available."

On February 6 TCI informed plaintiff that it would ship the balance of the accessories, except the tie rods, on February 9, and expected to ship the tie rods by February 29. Plaintiff thereupon notified the Officer in Charge of Construction that it would resume full-scale operations by the latter part of March if the TCI delivery promises were kept.

26. On March 6, 1952, the plaintiff revised its estimate to the defendant to April 15 for resumption of full-scale operations, because of TCI's telegram of March 4 that the balance of accessories, except 37 tie rod assemblies, would be shipped March 18, and that the tie rod assemblies were being delayed because of difficulties in securing nuts of a certain size.

27. On March 13, 1952, TCI advised the plaintiff that it expected the balance of the order to be shipped "over the week-end" and stated further:

"We want to assure you that we recognize the importance of this project and your order and we have been constantly following it for completion. Frankly, it seems that we have been jinxed by numerous rejections of the rounds at our producing mill and as a matter of fact the last material was only rolled over last week end, consisting of approximately 8 pieces of 2¾" and 2⅝" rounds."

The entire balance of plaintiff's order was shipped by TCI on March 20, 1952, and arrived at the jobsite by April 1.

28. The delays encountered by plaintiff in procuring its steel requirements were caused by TCI. The defendant was

not responsible for such delays. It is not established by the evidence: [4]

a. That there was any custom that DO ratings should accompany the award of the contract.

b. That the 14 days between the request on June 23, 1951, to the Bureau of Yards and Docks, for the issuance of a DO rating, and the receipt by plaintiff on July 7, 1951 (finding 6, supra), of such rating was slower than normal for the time in question. The section handling such requests was understaffed at the time and was faced in June 1951 with reclassifying existing DO ratings on current contracts to the new CMP classifications. Plaintiff's application for a third-quarter allotment on July 9 and 10, 1951, was processed and received by plaintiff 10 days later on July 20 (finding 8, supra). In the Fall of 1951 such applications were processed by defendant in 48 hours.

c. That TCI would have delivered plaintiff's steel requirements any sooner than it eventually did if the plaintiff had received its DO rating on June 25 when the contract was signed.

d. That the defendant acted arbitrarily on December 5, 1951, in denying plaintiff's request of November 19 for a directive to expedite the delivery of the steel requirements (findings 19 and 21, supra). Whether the Defense Production Act of 1950 implied a duty on the defendant's part to issue a directive under such circumstances is a matter of interpretation. It is probable that a directive would have resulted in a more prompt delivery.

29. Between November 16, 1951, and July 29, 1952, there were four change orders issued. Change A reduced the contract price by $854. Change B raised the contract price by $4,712. Change C, issued on July 8, 1952, extended the contract completion time for 120 days from May 20, 1952, to September 17, 1952, "due to delays in procurement beyond the control and without the fault or negligence of the plaintiff". Change D raised the contract price by $12,696.74 and extended the contract completion time another 60 days until November 16, 1952. The total extension of time by reason of additional work and "also by reason of delay in delivery of steel" granted by defendant to plaintiff, was 180 days. The total contract price was raised from $618,252 to $634,806.74, which was paid by defendant to plaintiff. Although plaintiff claimed a delay because of tardy issuance of Change Order D, no such claim is now made. The evidence does not reveal any actual delay other than the 60 days required for actual performance and which was granted under Change Order D. Although the defendant did not extend the time for completion of the contract beyond November 16, 1952, while the contract was actually completed on January 30, 1953, the defendant did not charge the plaintiff liquidated damages, because the work was usably complete on November 16, 1952.

30. On February 13, 1953, defendant sent to plaintiff a release to be signed by it and its assignee, the Mercantile National Bank of Miami, Florida. On February 16, 1953, T. D. Gray, plaintiff's treasurer, at the direction of Edward P. Comer, plaintiff's president, signed the release, as did plaintiff's assignee. The consideration for the release was the payment by the defendant of $119,453.86. Comer did not read the release when Gray brought it to him at his home, and Gray did not discuss with Comer what effect the signing of it would have upon any possible claims against the defendant. However, Comer directed Gray to sign it on behalf of the plaintiff company. Comer alone had the authority to sign the release on behalf of plaintiff, or to authorize Gray to sign it. Comer had always in the past signed such releases at the conclusion of plaintiff's many contracts with the defendant, and the instant release was the only one that Gray had executed on behalf of the plaintiff.

4. The negative predicate qualifies the statements in each of the succeeding paragraphs a through d in this finding.

Comer gave little or no consideration to the effect of the release which he authorized Gray to sign. An elderly man, he was in a condition of physical and mental exhaustion and was under treatment by his family physician. Comer's condition was brought about largely by a combination of circumstances. He had been in constant attendance for months on his wife who had been ill since the Fall of 1952 and who died on February 19, 1953, three days after the release was signed. A fire had destroyed his home during his wife's last illness. He was also under pressure to pay off his subcontractors and assignee under the contract in suit. However, his physician testified that, at the time the release was signed, he (the physician) would have been willing to sign as witness to the execution of a will by a person in Comer's state, although his condition was such as to impair the making of proper judgments and decisions, and it was difficult for him to concentrate on business matters because of his preoccupation with other troubles. Defendant exercised no pressure upon plaintiff to obtain the release. There is no evidence that Gray was unable to understand the nature of his act in signing the release, or that Comer was mentally incapable of understanding the nature and consequences of his act in directing the release to be signed, particularly if Gray had explained it to him.

31. On April 21, 1953, the plaintiff wrote to the District Public Works Officer outlining its losses under the contract and the reasons therefor, and requested a "renegotiation, looking toward the recovery of our loss just as much as we would have been if an excessive profit had been made."

32. On May 4, 1953, the District Public Works Officer replied to the plaintiff suggesting that it prepare a formal claim to the Bureau of Yards and Docks. The letter read in part:

"The District Officer-in-Charge of Construction is aware of the conditions which existed during the time of contract operation and realizes that unusual and extreme delays occurred in the delivery of the necessary materials for the accomplishment of the work. This office is also aware of the fact that your organization requested the issuance of a directive to allow the delivery of a small amount of materials; namely, tie-backs, washers and nuts, for the lack of which, your project work was delayed considerably even though approximately 1200 tons of sheet piling were at the site ready for installation. Since the type of project was not one on which the Navy Department considered it proper to issue a directive, your request for this action was denied. Whether or not the issuance of a directive would have caused delivery of the materials in time to avoid such an undue delay as existed might be further discussed, however, it is a known fact that the work of your project was unduly delayed because the necessary materials were not delivered because of the Controlled Materials Plan."

33. On February 1, 1954, the Bureau of Yards and Docks rejected plaintiff's claim in a letter reading in part as follows:

"The records confirm your contention that you experienced numerous delays in the procurement of materials, and it would appear that your costs were necessarily increased by such delays. However, adjustment for increased costs occasioned by procurement delay due to the Controlled Materials Plan or difficulties with suppliers is not provided for in the contract and therefore not within the purview of the Navy Department.

"It is further noted that the contract has been physically completed and a final release without exception has been delivered to the Government. While the Bureau understands and appreciates the personal difficulties which you indicate at-

tended the execution of this release, we are without authority to set it aside.

"Therefore, your request for additional compensation in the amount of $113,480.69 must be denied. This is a final decision of the Contracting Officer."

34. The plaintiff appealed the decision of the contracting officer and, on January 27, 1955, the Navy Contract Appeals Panel of the Armed Services Board of Contract Appeals dismissed the appeal for lack of jurisdiction. Thereafter, the instant petition was filed on June 7, 1957, pursuant to Senate Resolution 97 of February 18, 1957, as related in finding 1, supra.[5]

### Delays and Damages.

35. The completion date provided by the contract was May 20, 1952, 327 days after the notice to proceed was issued on June 25, 1951. The contract was substantially completed November 16, 1952, and fully completed January 30, 1953, 510 and 585 days, respectively, after the notice to proceed.[6] The plaintiff was given total time extensions of 240 days collectively by Change Orders B and D, which extended the overall time to November 16, 1952. No liquidated damages were assessed for the period from then to final completion on January 30, 1953, because the contract work was usably complete on November 16, 1952.

36. The steel sheet piling ordered by plaintiff from TCI was delivered in several installments between November 9 and December 10, 1951. The accessories such as wales, tie rods, etc., were fully delivered by March 27, 1952. The plaintiff based its bid on the reasonable expectation that delivery of its necessary materials would commence in September 1951 and would arrive in required stages

thereafter as needed. It expected originally to mobilize for the contract and to perform all demolition and other preliminary work starting immediately after June 25, 1951, so as to be ready to start driving steel sheet piling in September 1951. On learning that TCI would not start to deliver the steel sheet piling until November 1951, the plaintiff on August 25, 1951, prepared and furnished the defendant a revised performance schedule which scheduled the placing and driving of piling to start November 10, 1951. Both this revised schedule and the plaintiff's original schedule realistically contemplated the completion of the contract by May 20, 1952, and, if there had been no delay in the delivery of materials, the contract probably would have been completed by then, plus Change Order additions. The late delivery of the steel sheet piling and accessories forced the plaintiff to abandon an orderly sequence of operations. The steel sheet piling, when it arrived, could not be used effectively because the steel accessories prerequisite to its proper use were not available. Storage space for the piling on hand was inadequate, and the piling deteriorated and rusted in outside storage, later necessitating extra costs in derusting, cleaning, and coating with an anti-corrosion bituminous material prior to placing. In order to keep work crews busy the plaintiff resorted to makeshift work, such as placing the piling with a temporary jury rig pending the arrival of the accessories. Equipment such as cranes, tugs, barges, piledrivers, and boats which the plaintiff had brought to the worksite could not be profitably utilized in the absence of necessary materials, and thus remained idle for excessive periods. Payroll expenditures were much larger than the plaintiff had anticipated because wages had to be continued

---

5. Note that 28 U.S.C. 1492 authorizes the court, as to claims referred to it by resolution of either the Senate or House of Representatives, "to render judgment if the claim against the United States represented by the referred bill is one over which the Court has jurisdiction under other Acts of Congress."

6. The plaintiff actually started the work under the contract on October 10, 1951, instead of June 25, 1951, because of its material problems. Accordingly, one could subtract 107 days from the reference calculations to determine the actual working days on the job.

during periods of idleness or makeshift work in order to keep the crew intact for the time when the materials became available. Plaintiff's workmen were from the Miami area, and in order to engage their services at Key West, the plaintiff was required to pay for their housing at Key West. This expense was greater than anticipated because the period was more prolonged. When the materials were finally available the plaintiff was forced to hire additional equipment and personnel in order to make up for lost time. The following composite schedule shows, for each category of work, the starting and completion dates both as to the plaintiff's revised plan of procedure and the work as it was actually performed, together with allied information.

| Category of work | Revised procedure | | | Actual performance | | | Actual days over or under estimated | Delays in starting |
|---|---|---|---|---|---|---|---|---|
| | Start | Finish | Total days | Start | Finish | Total days | | |
| Demolition..................... | 10-10-51 | 12- 5-51 | 56 | 10-10-51 | 11-15-51 | 36 | (20) | 0 |
| Placing and driving piling....... | 11-10-51 | 4-10-52 | 152 | 12-17-51 | 7- 2-52 | 198 | 46 | 37 |
| Placing waler system............ | 11-15-51 | 4-15-52 | 152 | 3- 5-52 | 7-16-52 | 133 | (19) | 110 |
| Placing anchor and tieback system............... | 11-20-51 | 4-15-52 | 147 | 3-31-52 | 8-12-52 | 134 | (13) | 132 |
| Placing concrete, incl. cap and tunnel................... | 1-15-52 | 5-20-52 | 126 | 8-13-52 | 12-29-52 | 138 | 12 | 201 |
| Plumbing........................ | 1-15-52 | 5-20-52 | 126 | 9-16-52 | 1- 7-53 | 113 | (13) | 244 |
| Electrical....................... | 1-15-52 | 5-20-52 | 126 | 9-22-52 | 12-24-52 | 93 | (33) | 251 |
| Paving.......................... | 4-20-52 | 5-20-52 | 30 | 1- 8-53 | 1-29-53 | 21 | (9) | 263 |
| Fender system................... | 1- 1-52 | 5-20-52 | 140 | 8-13-52 | 1- 8-53 | 148 | 8 | 225 |

It is conceded by the defendant that none of the delays were attributable to the plaintiff's negligence. From an analysis of the foregoing composite schedule it is apparent that, in almost every instance, when the delivery of materials finally enabled the plaintiff to commence on a category of delayed work, thereafter the plaintiff performed that category in less time than its revised schedule provided, corroborating plaintiff's evidence that it speeded up the work wherever possible by employing additional equipment and personnel.

37. The plaintiff requests a finding that its losses under the contract totaled $118,374, which it attributes to the action or inaction of defendant. The parties stipulated that the plaintiff's cost of performing the contract exceeded its receipts by $53,788.28. The precise amount of the plaintiff's costs which were solely attributable to its delays in securing materials cannot be accurately computed, but it is reasonable to estimate that such extra costs amounted to $65,000. These extra costs fell into the following categories:

Labor

Employee maintenance at Key West

Equipment hire

Additional fill due to erosion

Cleaning and coating of steel

Loss of rentals from idle equipment

Overhead and depreciation

Other direct costs.

### Conclusion of Law.

Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.