**HARVEY–WHIPPLE, INC.**

v.

**The UNITED STATES.**

Cong. No. 1–58.

United States Court of Claims.
March 12, 1965.
Rehearing Denied June 11, 1965.

William H. Collins, Washington, D. C., for plaintiff. John S. Begley, Holyoke, Mass., of counsel.

M. Morton Weinstein, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COLLINS, Judge.

The subject of this congressional reference case is a claim for damages resulting from the alleged breach of a con-

tract[1] entered into by plaintiff and the Chicago Quartermaster Depot, Department of the Army (hereinafter referred to as "QM"). The House of Representatives has asked this court to inform the Congress of the nature of plaintiff's claim against the United States and the amount, if any, legally or equitably due to plaintiff.[2]

In March 1952, plaintiff, a Massachusetts corporation engaged primarily in the manufacture of heating equipment, obtained an invitation for bid, issued by QM, for the manufacture of "combination intrenching tools." This tool, a combination shovel, axe, hoe, and pick, was developed for the Army under a research and development contract by the Ames Company. It was considered as a critical war tool, to be used in the Korean conflict. The contract, pursuant to bids, was to be the first large-scale production of the redesigned version of a tool used in World War II. Plaintiff obtained a sample of the Ames tool, but bidders were warned that, because of changes, full reliance could not be placed upon the Ames design. In February 1952, plaintiff had entered into a contract with one Harry K. Tucker whereby he was to assist plaintiff in acquiring new business. It was through the efforts of Tucker that plaintiff received the invitation to bid.

Plaintiff submitted a bid which turned out to be the low one. Defendant was concerned about the adequacy of plaintiff's bid and its capacity, particularly financial, to handle the contract. After two preaward conferences in May 1952, the contract was awarded to plaintiff. Plaintiff was to manufacture 1,067,000

of these intrenching tools at the unit price of $1.80. The average of all 16 bids for this contract was $2.61 per item; the Ames Company, which had produced the first model (which was not wholly satisfactory), bid $2.27. The delivery schedule required an initial shipment of 50,000 units by October 31, 1952; deliveries were to be completed by July 31, 1953.

Under plaintiff's plan, the manufacture of the various components would be performed by subcontractors with plaintiff doing the assembling and packing. Accordingly, in June 1952, plaintiff awarded to Northern Handle Mills, Inc. (hereinafter referred to as "Northern"), a subcontract for production of the handles. Plaintiff ordered the mental components, i. e., blades, picks, hinges, and sockets, from Meriden Industries Company (hereinafter referred to as "Meriden"). Plaintiff supplied the subcontractors with the Government drawings and specifications, but did not send any detailed instructions. Northern, in July 1952, expressed concern to plaintiff that the broad tolerances of the specifications might lead to difficulty with regard to the fitting of sockets and handles.

On August 4, 1952, the Reconstruction Finance Corporation (hereinafter referred to as "RFC") authorized a loan of $500,000 to plaintiff. Previously, plaintiff had obtained another RFC loan. Both RFC loans were secured by a mortgage on plaintiff's property, and, as additional security for the second loan, RFC took an assignment of the proceeds of the intrenching tool contract. Under the assignment, the Army would pay RFC

---

1. Actually, the agreement of the parties was, for administrative purposes, embodied in three contracts. This discussion will treat the three contracts as one contract.

2. On August 29, 1957, H.R. 9552, entitled "A bill for the relief of Harvey-Whipple, Incorporated," was introduced in the House of Representatives. (H.R. 9552 is contained in finding 123.) On April 1, 1958, the House of Representatives passed House Resolution 487 which referred to the Court of Claims H.R. 9552. (H.Res.

487 is set out in finding 126.) Authority for the reference is contained in 28 U.S.C. §§ 1492, 2509.

The petition in the instant case was filed on August 15, 1958, prior to the decision of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). This court deems it proper to file this report without reference to the Supreme Court's opinions in the latter case, and we reject defendant's assertion of lack of jurisdiction.

for shipments received from plaintiff and, subject to certain conditions, RFC would release the funds to plaintiff.

As of October 31, 1952, no intrenching tools had been delivered, since a steel strike had made it impossible for Meriden to obtain needed raw materials.

In November 1952, plaintiff submitted to the contracting officer preproduction samples of the tool. The samples were tested by the Quartermaster Research and Development Laboratory at Jeffersonville, Indiana (hereinafter referred to as "R & D"). Numerous deficiencies (e. g., failure to pass strength tests) were discovered and the samples were not approved. On December 29, 1952, plaintiff delivered to the contracting officer a second set of samples and, at the same time, requested permission to be present at the R & D laboratory during the tests. (Subsequently, plaintiff's request was denied.) In January 1953, plaintiff was advised that the second samples were also defective, but that it would not be necessary to submit further preproduction samples. Within a short time, manufacture of the components, other than the socket, began.

In February 1953, during the first stages of production, plaintiff discovered that the dimensions contained in the Government drawings were such that, at one point, there would be a 1/16-inch gap between the hinge and the blade. On February 25, 1953, plaintiff informed the contracting officer of this matter, but plaintiff received no immediate instructions.

The contracting officer, on February 27, 1953, wrote plaintiff that the delivery schedule was being extended by 154 days. This extension was based upon the excusable delay resulting from the steel strike. Still, plaintiff was unable to meet the delivery schedule; one cause of plaintiff's inability was the fact that Meriden failed to ship equal or nearly equal numbers of the four components. Such unbalanced deliveries from Meriden were to be a recurring problem. Furthermore, a large percentage of the tools which plaintiff did complete failed to pass inspection.

In late April 1953, the QM Inspection Division determined that metal-to-metal contact of blade and hinge was required. Plaintiff sought to achieve such contact by applying pressure to the rivet which joined the two parts. On May 27, 1953, three officers of QM visited plaintiff's plant. At that time, plaintiff discussed with them the following problems which plaintiff attributed to errors in the drawings: the metal-to-metal contact of hinge and blade; the position of the pick when closed; and interference of the pick with the blade during closing. Plaintiff agreed to submit the entire matter in writing for transmission to R & D. Also, plaintiff's officials asked permission to go to R & D.

On June 24, 1953, plaintiff submitted its letter regarding the various problems. On July 14, 1953, pursuant to permission granted by QM, three representatives of plaintiff went to the R & D laboratory for discussion of the errors in the drawings and specifications.

Subsequently, plaintiff prepared a list of 24 suggested changes. Representatives of plaintiff and defendant discussed the proposals at a conference on August 21, 1953. Ultimately, defendant agreed to incorporate in a formal change order 20 of plaintiff's suggestions, including (1) correction of the drawings and (2) reduction in the stringency of certain tests. With regard to the remaining four proposals, the contracting officer informed plaintiff that inclusion in the change order was unnecessary, but that the Government would not object if plaintiff used the dimensions suggested by these proposals. On September 21, 1953, the parties entered into Supplemental Agreement No. 2 which effected the changes, increased the contract price by 11.341 cents per item, and extended the delivery schedule. Plaintiff, having sought a 36-cent per item increase, considered the amount of the price increase to be too low and, accordingly, initiated an appeal under the disputes clause.

However, plaintiff did not pursue the appeal.

Meanwhile, on September 8, 1953, because of plaintiff's inability to meet its indebtedness to Meriden, the latter company had halted the production of the metal parts. This resulted in the stoppage of production of the intrenching tools until February 1954, when Meriden resumed shipping the components.

As of January 31, 1954, plaintiff was seriously delinquent on its delivery schedule. To avoid being held in default and to obtain further revision of the delivery schedule, plaintiff offered to supply the remaining tools at a slightly reduced unit price. Defendant accepted plaintiff's offer and a new supplemental agreement was executed on February 17, 1954.

After the resumption of production, there was a considerable decrease in the rate of rejections. However, plaintiff's financial difficulties continued. Plaintiff was still unable to make deliveries as required by the contract. In June 1954, the contracting officer denied plaintiff's request for further extension of the delivery schedule, pointing out that inability to secure adequate financing did not constitute an excusable cause for delay.

On August 13, 1954, because of plaintiff's failure to make deliveries as required, the contracting officer reduced the number of tools to be manufactured. Plaintiff appealed this partial termination to the Secretary of the Army.

On January 15, 1955, when the existing delivery schedule expired, plaintiff was delinquent to the extent of 412,000 tools. On February 10, 1955, the contracting officer issued a notice of default which directed plaintiff to demonstrate its ability to make substantial deliveries. At plaintiff's request, a conference was held on February 24, 1955, during which plaintiff made a proposal for continuation of the contract. Under the suggested plan, (1) plaintiff would withdraw its appeal from the partial termination; (2)

plaintiff would forego any claims it had, or might have, based upon the prior performance of the contract; (3) the unit price would be reduced; and (4) a new delivery schedule would be effected. In March, the parties reached an agreement which embodied plaintiff's proposal. Accordingly, on March 17, 1955, plaintiff executed a complete release which, *inter alia*, expressly discharged the Government from any liability to plaintiff based upon discrepancies in the contract or the specifications.

In April 1955, the maturity date of the second RFC loan was, for the fifth time, extended. Still, plaintiff experienced financial difficulty and was unable to pay its subcontractors. Consequently, after July 1955, no further deliveries were made under the contract. Formal termination of the contract for default was effected as of February 4, 1957.[3] Plaintiff's appeal to the Armed Services Board of Contract Appeals was dismissed, the Board holding that it had no equity jurisdiction to reform the release which plaintiff had given.

On March 8, 1957, the Government obtained in the United States District Court for the District of Massachusetts a judgment of foreclosure of the mortgages given by plaintiff to secure the RFC loans. The sale of plaintiff's property resulted in a substantial deficit. As of October 24, 1958, the unpaid balance was $156,578.03.

The first question to be considered is whether plaintiff has a valid "legal or equitable claim" within the normal meaning of those terms. That is, does plaintiff have a claim which could be successfully pursued in a court of law or equity?

Plaintiff contends that the acts and omissions of defendant with regard to the intrenching tool contract resulted in the destruction of plaintiff's financial condition. According to plaintiff, the initial source of difficulty was the furnishing by the Government of faulty drawings

---

3. Actually, February 4, 1957, is the date upon which the last of the three contracts was terminated.

and specifications. Plaintiff argues that the erroneous provisions of the contract, coupled with defendant's failure to make timely corrections, caused the large number of rejections. Finally, plaintiff's financial distress and inability to perform were consequences of the fact that, to the extent of the rejections, no payments were forthcoming.

■ As indicated in finding 128, it is reasonable to attribute to the defective drawings and specifications a large percentage of the rejected completed tools. This court is unable to accept the contentions of defendant that the drawings and specifications contained no errors and that the sole cause of such problems as the fit of the hinge and blade was improper engineering by plaintiff. Despite the errors and delays on the part of defendant, it does not necessarily follow that plaintiff has a valid legal claim. Consideration must be given to defendant's assertion that the Government has been released from any liability stemming from defects in the contract provisions.

■ The express terms of the release demonstrate the validity of the Government's contention. The release states (in part):

"HARVEY-WHIPPLE, INC., does hereby, * * * release and forever discharge the UNITED STATES * * of and from all * * * causes of action, * * * damages, claims and demands whatsoever in law or equity or under administrative procedures which * * * the said HARVEY-WHIPPLE, INC., ever had, now has or may have for or by reason of any matter, * * * arising under and by virtue of * * * [the intrenching tool contracts]

* * * from the beginning of the world to the date of these presents, it being the intention * * * of the parties that this release * * shall apply to but is not limited to (a) any difficulties, conflicts, ambiguities, inconsistencies, discrepancies, or impossibilities which may have been or may be contained in the * * * [contracts] and any specifications referenced therein, (b) any upward adjustment in price under the terms and conditions of Supplemental Agreement No. 2 * * * in excess of $0.11341 per unit and (c) the Notices of Partial Termination for Default, dated 13 August 1954, * * *."

Therefore, assuming the release to be valid, no legal liability of defendant can be predicated upon the defects in the drawings and specifications. Furthermore, the release extends to *all other claims* of plaintiff, relating to the performance of the intrenching tool contract, which arose prior to March 17, 1955, the date when the release was executed.

Approximately 4 months elapsed between the date of the release and July 29, 1955, the date of the final shipment by plaintiff. Plaintiff did not stress or argue that any of defendant's actions during that period could be considered as breach of contract. Nor can liability be based upon defendant's conduct during the interval from July 29, 1955, to February 4, 1957, when formal termination was completed.[4] The conclusion follows that any possible claims of plaintiff were included within the terms of the release. Plaintiff, however, seeks to avoid the effects of the release by asserting that defendant obtained the release by means of duress.

---

4. The nature and amount of damages claimed by plaintiff are described in finding 127. Plaintiff seeks such items as the unpaid balance on the RFC loans and lost profits for the years 1952–59. Thus, plaintiff attempts to measure the damages resulting from the alleged breach of contract, at least in part, on the basis of events which occurred subsequent to execution of the release (and subsequent to termination of the contract). However, the important fact, as explained above, is that the alleged liability-creating acts on the part of defendant occurred prior to the release.

■ Examination of the circumstances which gave rise to execution of the release compels the conclusion that there was no coercion or duress on the part of the Government. Of prime significance is the fact that the proposal whereby plaintiff would forego its claims originated with plaintiff, not with the Government. On January 25, 1955, *prior* to issuance of the notice of default, representatives of plaintiff went to QM for a conference. Plaintiff included in a proposal which was designed to achieve an extension of the delivery dates the waiving of all claims against the Government. Plaintiff's plan (which involved the taking over of plaintiff by a certain group of businessmen) did not materialize. Still, this court is confronted with the fact that the idea of releasing the Government was initiated by plaintiff.

Also, at the February 24, 1955, meeting (held subsequent to the default notice), it was plaintiff who voluntarily proposed, *inter alia,* that plaintiff forego its claims and covenant not to sue. Plaintiff's offer furnished the basis for the March 9, 1955, "Memorandum of Understanding" which in turn was incorporated in the supplemental agreement of March 17, 1955. One aspect of the latter agreement was the execution by plaintiff of the release. It is important to note that the purpose of plaintiff's proposal was achieved, i. e., the contract was not terminated for default, and plaintiff secured an extension and revision of the delivery schedule.

■ When the contract was executed, plaintiff's business had declined and its financial picture was weakened. This increased during the performance of the contract until, at the time of execution of the release, plaintiff was in serious financial difficulty. However, this is not a ground for holding the release invalid.

Cf. Alloy Products Corp. v. United States, 302 F.2d 528, 157 Ct.Cl. 376, 381 (1962).[5] Another underlying circumstance was the fact that the contracting officer had served upon plaintiff a notice of default. In view of plaintiff's serious delinquency at the time, issuance of the default notice was proper and its existence did not affect the validity of the release.

To summarize, this court holds that the release (1) was not obtained through duress, (2) was valid and binding, and (3) bars any legal or equitable (in the juridical sense) claims which plaintiff might have. Cf. J. G. Watts Constr. Co. v. United States, 161 Ct.Cl. 801 (1963) (release); Cannon Constr. Co. v. United States, 319 F.2d 173, 162 Ct.Cl. 94 (1963) (accord and satisfaction).

■ A second issue in this congressional reference case is whether plaintiff has an "equitable" claim within the broad, moral concept as enunciated in Burkhardt v. United States, 84 F.Supp. 553, 113 Ct.Cl. 658, 667 (1949). Despite our conclusion that the release bars any claims of the type cognizable in a court of law or equity, it does not automatically follow that the same result applies to "equitable" claims in the broad sense. Rocky River Co. v. United States, Ct.Cl. Cong. No. 7-60 (January 22, 1965). See also Drake America Corp. v. United States, Ct.Cl. Cong. No. 11-58 (December 11, 1964).

In determining the effect of a release upon "equitable" claims, this court has gone beyond the traditional grounds for avoiding such an instrument (i. e., duress, mutual mistake, etc.) and has looked into the circumstances which gave rise to the release. For example, in a recent congressional reference case, Rocky River Co. v. United States, supra, this court held that the plaintiffs had a valid "equitable" claim, even though any

---

5. In Alloy Products Corp. v. United States, supra, the court rejected the plaintiff's assertion that a renegotiation agreement had been obtained through duress. The court noted, *inter alia,* that during the conferences which preceded execution of the agreement, Alloy Prod-

ucts had been represented by counsel. In the instant case, plaintiff's attorney, Mr. Begley, was present during the negotiations regarding continuation of the contract (and the giving of a release). See findings 104 and 106. See also finding 124.

legal claims were barred by general releases. Our decision was based upon a finding that the releases did not contemplate disposition of the matter in question (damages resulting from the defendant's failure to remove all unexploded shells from the plaintiffs' lands). That is, when the releases were executed, the Government and the plaintiffs all had believed that the former would successfully clear the latter's lands of unexploded shells. Thus, the case was distinguished from Hellander v. United States, 178 F.Supp. 932, 147 Ct.Cl. 550 (1959), where, at the time of execution of a general release, both parties were fully aware of the claim which the plaintiff subsequently attempted to assert. In Hellander, also a congressional reference action, the existence of the release was one of the alternative grounds for a decision adverse to the plaintiff.

■ However, even the more flexible rule exemplified by Rocky River Co., supra, does not require, in the case at bar, that the release be set aside. As indicated in our discussion of plaintiff's "legal" claim, the release was not forced upon plaintiff by the Government. On the contrary, the granting of a release was part of a plan which plaintiff itself had originated. At the time when plaintiff executed the release and discharged the Government, plaintiff was fully aware of its situation and all matters upon which its present claim is based. Plaintiff's goal in entering into the supplemental agreement, one part of which was execution of the release, was to avoid termination for default and to obtain from the Government a revision and an extension of the delivery schedule. Defendant did grant the changes requested by plaintiff, and, although plaintiff's hope of completing performance of the contract was not realized, the fact remains that plaintiff received the "bargained-for" consideration. Under these circumstances, this court cannot escape the conclusion that the release bars plaintiff's "equitable" claims, in the nonjuridical sense, as well as those cognizable in a court of law or equity.[6]

Even in addition to the circumstances of the release, there are factors which support our conclusion that plaintiff has no "equitable" claim. As defendant points out, the RFC granted, at plaintiff's request, five extensions of the second loan. The cumulative effect of these extensions was to change the maturity date from September 30, 1953, to December 31, 1955. Also, with regard to the intrenching tool contract, numerous extensions of the delivery schedule were granted. Thus, the record does not support plaintiff's contention that the attitude of the Government toward plaintiff was one of harassment and noncooperation. As already indicated, two major sources of plaintiff's difficulty were plaintiff's own financial position (which had begun to decline prior to the intrenching tool contract) and plaintiff's reliance upon Meriden as the major subcontractor. Responsibility for these two factors cannot be placed upon the Government.

In view of our conclusion that plaintiff has no claim, legal or equitable, it is unnecessary to discuss the affirmative de-

---

6. Plaintiff, in its brief, points out that, prior to referring this case, the Congress was aware of the release. According to plaintiff, this indicates that the release should not necessarily be binding "when the equities of the situation" are considered. A somewhat similar contention was made in the case of M. F. Comer Bridge and Foundation Co. v. United States, 178 F.Supp. 808, 147 Ct.Cl. 504 (1959). In the latter case, the plaintiff argued that the Senate bill which was referred to this court provided that this court ignore a release which had been signed by the plaintiff. This court stated,

178 F.Supp. at 811, 812, 147 Ct.Cl. at 509:

" * * * We cannot read into S. 156 [the bill for the relief of the plaintiff] any such provision, and even though it had contained such a provision, it would have no force and effect in a court. * * *

* * * * *

" * * * In any event, it is for the court to determine whether or not plaintiff has an equitable claim and such determination must flow from the facts and not the wording of the pending legislation."

fense pertaining to violation by plaintiff of the covenant against contingent fees.[7] Another affirmative defense stems from the RFC loans and defendant asserts the unpaid balance of the loans as a counterclaim.

 The record before the court shows that the defendant, knowing that plaintiff corporation was (and still is) nonfunctioning as a business enterprise or going concern and insolvent, elected to proceed against the personal guarantors of the notes to the RFC and has obtained a judgment in the United States District Court for the District of Massachusetts against them.[8] Since a deficiency judgment against Harvey-Whipple, Inc., would be uncollectible (unless relief were given by Congress), it being insolvent, and since this court recommends no relief for plaintiff, the court, although it has the power to do so, declines to enter judgment for defendant against the plaintiff corporation on the defendant's counterclaim, which is dismissed without prejudice. Should the defendant wish to pursue the matter further, it may do so in the District Court in Massachusetts where the foreclosure proceedings were instituted and where the action against the guarantors has been taken.

This opinion, concluding that plaintiff has no claim, legal or equitable, against the United States, and the findings of fact incorporated *infra*, will be certified by the Clerk to Congress pursuant to House Resolution 487, 85th Congress, 2d Session.

---

7. Defendant, in its amended answer which was filed on June 3, 1959, asserted the violation of the covenant against contingent fees both as an affirmative defense and as the basis for a counterclaim. However, in its brief, the only counterclaim which defendant asserts is that regarding the RFC loans. This court interprets defendant's actions as constituting a waiver of any counterclaim founded upon the contingent fee matter. This determination on our part should not be construed as an indication of our view regarding the question whether plaintiff's agreement with Tucker did violate the contractual covenant. As stated above, we find it unnecessary to consider this question.

8. In addition to the foreclosure action taken by the Government against Harvey-Whipple, Inc., the Government also proceeded in the United States District Court for the District of Massachusetts, 6 months after the sale of the property under foreclosure on March 21, 1958, against the individual guarantors of the indebtedness, Walter O. Harvey and his wife, Edna R. Harvey, Ray G. Whipple and his wife, Violet V. Whipple, and Frank R. Swayne and his wife, Rita C. Swayne (Civil Action No. 58–933–S, filed on or about September 12, 1958). That court entered a judgment on or about May 5, 1961, in the amount of $174,585.-20, plus costs and interest. Execution on this judgment has been stayed pending determination of this present action.

In argument before this court, plaintiff's counsel pointed out that Harvey-Whipple, Inc., had been closed since the Government took over the plant, pursuant to foreclosure, and was insolvent.